251 N.J. Super. 419 (1991)
598 A.2d 899
STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF-RESPONDENT,
v.
T.C. AND I.R., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1991.
Decided October 29, 1991.
Before Judges PRESSLER, SHEBELL and SKILLMAN.
Melanie J. Swade argued the cause for appellant T.C. (Monaghan, Rem & Zeller, attorneys; Melanie J. Swade and Ralph J. Lamparello, on the joint brief).
Ralph J. Lamparello argued the cause for appellant I.R. (Chasan, Leyner, Tarrant & Lamparello, attorneys; Ralph J. Lamparello and Melanie J. Swade, on the joint brief).
*420 Ressie Fuller-Troutman, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ressie Fuller-Troutman, on the brief).
Thomas Zammatore, Guardian ad litem, argued the cause for D.C., a minor.
Nancy Goldhill argued the cause on behalf of amicus curiae Legal Services of New Jersey.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
T.C. and I.R. appeal from an order of the Family Part, entered pursuant to N.J.S.A. 30:4C-15, which terminated their parental rights to their daughter, D.C., who, together with her older brother, was taken into protective custody by the Division of Youth and Family Services (DYFS) when she was two and a half years old. This appeal requires us to determine whether the order can be justified largely on the expert's opinion that despite the present fitness of the parents, despite the return to them of the other child, and despite the resultant permanent severance of D.C. from her biological parents and her siblings, parental termination is required by reason of the harm the expert predicts that D.C. will suffer by severance of the bond which has already taken place between her and her foster mother, who proposes to adopt her. Our careful review of the record persuades us that under the circumstances here, the termination order must be reversed.
These are the circumstances which led to T.C.'s and I.R.'s loss of their child. In 1981 T.C., then 21, gave birth to a son R.Y., with whose father she had been living but to whom she was not married. They continued to live together as a family until R.Y.'s father was sentenced to a life term in prison when R.Y. was about three months old. She then returned with the baby to her mother's home in Union City despite generally poor relations between them and a history of the mother's abuse of *421 T.C. Shortly thereafter, T.C. met I.R., a man in his fifties, who had recently arrived in the United States from Marielle, Cuba. In 1982 they started living together, I.R. acting as a father to R.Y. and generally supporting both R.Y. and T.C. by working at a variety of jobs. According to the uncontradicted testimony of both I.R. and T.C., the three of them formed a stable, well-functioning family unit. Indeed, despite some periods of difficulty between I.R. and T.C., they are still together in a stable relationship.
D.C., the child we are presently concerned with, was born to I.R. and T.C. in November 1985. In preparation for her birth, they rented a new apartment in Jersey City which they painted, furnished and had moved into shortly before she was born. The family continued to live there until its eviction in March 1988 for nonpayment of rent.
DYFS had become involved with the family some time prior thereto. The protective services worker responsible for the family until November 1988 was unable to testify at the June 1990 termination trial because of illness. The history of that period of DYFS involvement can, however, be gleaned from the DYFS records, particularly the worker's handwritten contact sheets, which were introduced into evidence.
The first contact with DYFS occurred in May 1986 when T.C.'s mother and brother, later largely discredited as reliable informants, communicated with DYFS to charge that T.C. was giving R.Y. cocaine and permitting him to "discipline" D.C. The worker visited the home and found no evidence to substantiate the charge. In June 1987 T.C. herself asked DYFS for assistance with R.Y., then six, whose behavior she was having difficulty in controlling. She believed the boy to be troubled in some way and was referred by DYFS to a physician, who failed to diagnose anything abnormal. R.Y. was, however, later diagnosed and treated as a hyperactive child during his institutional placement, hereafter referred to, at Wiley House in Pennsylvania. In any event, DYFS remained involved with the family to *422 assure R.Y.'s regular school attendance. A case note in December 1987 recorded that R.Y. was enrolled in school and was in the first grade.
The DYFS contact sheets next cover a period from early January 1988 to the late March 1988 eviction. A field visit note of January 14, 1988, reports that the two children "appeared clean," were "adequately dressed," and were "outgoing  friendly  not fearful." The home was reported to be "adequately furnished" and "kept in a relatively neat clean manner  no health hazards noted." T.C. was not home at the time of the visit. The children were reported to be in the care of T.C.'s brother, who was apparently living there, and I.R., referred to as the "mother's live-in boyfriend" rather than as D.C.'s father. A similar report was made of a visit on January 26, 1988. Again the children were observed to be "adequately dressed and appeared clean. They were friendly and mother and children appeared to interact in a reasonable manner  no fear indicated in children."
On February 1, 1988, DYFS received an anonymous call, apparently from T.C.'s mother, reporting that T.C. had been arrested on drug charges, that she was using her welfare check for drugs, and that she was leaving the children alone while she went out selling drugs. That note continues with the report that "supervisor responded ... children not alone ... other info not verified re: drugs." It was, however, true that T.C. had been arrested on a minor drug paraphernalia charge and was placed on probation under the conditional release provision of N.J.S.A. 24:21-27. The paraphernalia consisted of a balance scale which, she claimed, belonged to her brother.
During the next several weeks, DYFS continued to receive anonymous calls, again apparently from T.C.'s mother and brother, charging her with drug use and neglect of the children. DYFS' responsive field visits continued to be generally uncorroborative although it did appear that R.Y.'s school attendance was not regular due at least in part to illness. On two *423 occasions, however, it appeared that there was insufficient money in the household to assure an adequate supply of food, and emergency assistance was given. As late as March 1988, field visits continued to result in reports of appropriate care to the children and of the home and no evidence of drugs or drug use. It also appears that by some time early in 1988, I.R. was unemployed and the family had resorted to welfare assistance.
Disaster struck in late March 1988 when the family was forcibly evicted for non-payment of rent, T.C. having been "afraid" to go to court when noticed of the summary dispossess proceedings. She advised DYFS of this calamity and sought refuge for the family with her mother. An ensuing conversation between the DYFS worker and T.C.'s mother confirmed the mother's declination to take them in and the repeat of her charge that T.C. "was a drug ... addict" and "could lay down in the street and die." The family then sought assistance from the Hudson County Welfare Department, which referred them to a shelter. This was apparently not an appealing alternative, and upon T.C.'s further request of DYFS for assistance, she was told "that DYFS could offer foster care assistance  she said no  told [T.C.] it was her responsibility to provide for food and shelter and clothes and school and medical care for children." It appears that T.C. then used her welfare check to pay for a hotel room for herself and the children. When that resource was exhausted she again, on April 6, 1988, called the DYFS worker, who again advised her to seek assistance from welfare, again offered foster care which T.C. rejected and again warned T.C. that if she did not provide for her children "DYFS will consider court ordered intervention." T.C. was also instructed to call DYFS within two days to "inform worker of status of herself and family." She did not. In the meantime, DYFS, still reposing some degree of confidence in T.C.'s mother, explained to her "the procedure for removal of children from parent" upon the mother's assertion that T.C. "is not competent to care for children and the children should be taken away from [her]." An illuminating note of April 10, 1988, then *424 explains that T.C. was on that date unable to obtain emergency shelter assistance from the Welfare Department and was further told by welfare that her regular welfare check was being withheld to assure her communication with DYFS.
In the ensuing days T.C. stayed with friends, avoided DYFS, missed her probation visits, and arranged with her mother temporarily to care for R.Y. while she kept D.C. with her. Finally on April 15, 1988, T.C. advised the DYFS worker that she had found a place to live for herself, I.R. and D.C. in a basement apartment in Jersey City and asked for the release of her welfare check so she could pay the rent. DYFS conducted a home visit at that apartment on April 18 and apparently found the living arrangements acceptable. D.C. was reported to be "clean and adequately dressed" and T.C. was reported to have "vacillated between responsive and anger and refusal to discuss issues. [I.R.] attempted to calm her down and to participate in discussion." It is clear that T.C.'s hostility to the DYFS worker had escalated all during this period.
The next legible note, dated May 16, 1988, reports that T.C. called to tell the DYFS worker that the family, including R.Y., was now with another friend and that R.Y. was behaving badly and was trying to return to his grandmother's. The worker visited the next day and was told by T.C. that the family had to make a new arrangement because of a quarrel with the friend. T.C. refused to let the worker see the children, and the worker explained her options to her, namely, "she could sign for both children voluntarily (1) no court involvement  she could obtain municipal welfare for herself and get things together, (2) court involvement to supervise, (3) court to remove children. [T.C.] said no." T.C. and the family left the friend's home that day. The friend, who was actually a friend of T.C.'s mother, then promptly reported to the DYFS worker that during the two weeks the family had been with her, T.C. and I.R. were free-basing cocaine, not feeding the children, generally neglecting them, and abusing them by hitting and punching them. The friend further alleged that T.C. threatened to kill the children, *425 that T.C. had contributed only $70 "for staying there two weeks" and that T.C.'s mother was a "drug user and pusher." Finally the friend reported that T.C. had obtained money by pawning a stolen diamond ring and other items she had stolen from friends. None of this information was ever, insofar as the record indicates, investigated or corroborated.
Finally, on May 27, 1988, based primarily on the worker's affidavit repeating the information provided by the "friend," DYFS filed a protective custody complaint under N.J.S.A. 9:6-8.28 and obtained an ex-parte temporary emergency order authorizing its removal of the children. They were in fact removed on May 31, 1988, as T.C. was attempting to obtain shelter at St. Lucy's shelter. The children were first placed together in a temporary foster home, where they could not remain because of R.Y.'s behavioral problems. Within several days D.C. was placed in the foster home in which she still resides with her foster mother, a single parent whose household included her three teenage daughters ages 14 to 18, an adopted 2 1/2 year old and another young foster child. R.Y. was placed for a time in a welfare hotel with a series of paid "homemakers," then briefly in another foster home where he could not be managed, and finally in late summer 1988 at Wiley House, where his hyperactivity was finally diagnosed and treated. At the time of their removal, D.C. was two and a half and R.Y. was seven.
It is against this explanation of T.C.'s and I.R.'s original loss of custody of the children that we consider the subsequent administrative and judicial events leading to the termination order. To begin with, although it does appear that T.C., and perhaps I.R. as well, were, during this period, occasional drug users, there is nothing in the record to suggest either debilitating use, habitual addictive use, or distribution by either. There is, of course, a great deal of desperation in their story. They were not coping well with their impoverished circumstances, had no family support and were unemployed if not unemployable. T.C. is barely literate, I.R. is not fluent in *426 English, and both were living on welfare. Both were also fearful and distrustful of any governmental system, including the court, which could have aided them. In any event, neither parent saw D.C. again until her third birthday on November 21, 1988, six months after the removal, and they did not see R.Y. until much later.
The first scheduled court date following the temporary custody order was June 16, 1988. Ten days prior thereto, the DYFS worker went to the apartment where T.C. was then staying and personally served her with process. T.C. asked if she would lose her children forever and was assured she would not, but that she would have to provide a proper home for them before the children could be returned. When T.C. asked about visiting the children, the worker told her that would be arranged at the court hearing. At that point T.C. advised the worker that she could not be in court on June 16 as she had an appearance to make before another court at the same time on a drug charge. The DYFS worker "advised that she needed to change [the criminal court] date."
I.R. was apparently not personally served. Indeed he was apparently never separately served or noticed throughout these proceedings. It appears from the reference to him in the contact sheets as the "live-in boyfriend" and in the initial complaint as the "mother's paramour," that his status as D.C.'s biological father was overlooked.
Neither I.R. nor T.C. appeared at the June 16 hearing. T.C.'s mother, however, had apparently telephoned the DYFS worker to report that T.C.'s absence was due to her presence at the Union City police station because of assault charges made against her by her brother. As a result of T.C.'s non-appearance, the protective custody order was continued and a new court date of September 29, 1988, was scheduled. The record does not indicate whether T.C. or I.R. had actual knowledge of that date or what steps, if any, DYFS took to advise them of it. Neither appeared. The custody order was continued until January *427 5, 1989. The protective services contact sheets for the period from June 1988 until November 1988 do not disclose a single contact with the parents initiated by DYFS, although DYFS knew for the most part where they were living. Nor is there recorded any contact initiated by the parents, although T.C. testified at trial that she had frequently called DYFS, was placed on "hold" for long periods of time and was never put through.
The notes for the period, from June to November 1988, also report R.Y.'s travails and D.C.'s adjustment and growing attachment to her foster mother. Both children during this period are reported as having asked for each other. It is also clear that T.C.'s life during this period was in upheaval. She was jailed in late summer of 1988 for 30 days on a drug-connected probation violation which she disputed, both she and I.R. were on welfare, and both wound up living together at a welfare motel in Journal Square in Jersey City after a fire destroyed the apartment they had found. She was also pregnant with I.R.'s child.
In early November 1988, the children's case was transferred internally from the protective services unit of DYFS to the permanency planning unit, and a worker from that unit, who did testify at trial, was assigned to supervise the matter. Following the transfer of the case to permanency planning, the new worker so advised T.C. and I.R. in apparently the first DYFS contact since the children's removal. The parents expressed the desire to see the children and were told that they first had to come to the DYFS office in Bayonne. There they were told that R.Y. could not be seen because of the rules of his program at Wiley House but that a visit would be arranged with D.C. at the DYFS office in Bayonne. The visit took place on November 21, D.C.'s third birthday. It was lengthy and positive. Indeed I.R. played the same games with D.C. as he had before the family separation, and D.C., despite her initial reluctance to leave her foster mother, appeared to be quite at ease after the initial strangeness of seeing her parents again *428 wore off. The visit went well enough for the worker to leave the three of them alone for a short period of time. T.C. was then seven months pregnant.
The DYFS family reunification goal  that still then being the expressed goal  was apparently to be implemented by monthly visits at the DYFS office in Bayonne, and a next visit was planned for December 22. Prior to that date, T.C. telephoned the worker to tell her she had given birth prematurely on December 8, and the baby had died almost immediately. She was concerned about obtaining welfare help to bury the baby. There are suggestions but no documentation that the baby died because of T.C.'s cocaine use during her pregnancy. In any event, T.C. later requested that the December 22 visit be rescheduled for some other time of day since, at the appointed hour, she was planning to go to a church which was offering a free hot holiday meal. The worker told T.C. the hour could not be changed, but because she thought T.C. might be depressed over the loss of the baby, she decided to "give her another chance." The visit was rescheduled for December 29. On that morning T.C. telephoned the worker to ask for a ride from Jersey City to the DYFS office in Bayonne as she had no money for transportation and no way to get there. The worker refused transportation assistance. The visit was consequently canceled.
On January 5, 1989, the next scheduled court date, neither T.C. nor I.R. appeared. While they may have been told a hearing would then take place, they were not told that DYFS would then be seeking an order suspending parental visitation. Such an order was in fact sought and granted based primarily on the DYFS worker's report to the court that:
And at this point, I do know from her reaction and from the monitoring of the foster mother, that this child is going through a lot of emotional distress with these visits. And there is no  I supervised the last visit, there is no nurturance between the two. I mean I've watched her behavior, she's very fearful of both parents and very apprehensive. And it took her quite some time to even walk over and approach her mom. So I think this child is a victim of the abuse and *429 how severe, we don't know and cannot be told until later on. And right now, I just think it's really detrimental.
This report, in both text and tone, is sharply at odds both with the worker's detailed description of a positive and happy visit which was elicited from her on cross-examination at the termination hearing and with the complete lack of any corroborated act of abuse anywhere in this record.
Not the least of the disturbing details of this case is the fact that the worker's contact sheet describing the parents' November visit with D.C. is missing from DYFS' file, and it may well be that neither the DYFS attorney requesting suspension of parental visitation in January 1989 nor the attorney representing DYFS at the termination hearing was aware of what had actually happened at the visit. That indeed so appears from the direct examination of the worker on that factual issue, the worker referring to the visit as having taken place "with a lot of difficulty on my part, and [D.C.'s] part also." In fact, the worker's whole description of the visit on direct examination referred only to the child's reluctance to leave her foster mother without a word said about the actual success of the visit, which the worker's cross-examination revealed. Most telling of all was the testimony of the court-appointed psychologist, the sole expert in the case, who said he had not previously known about the visit and opined that because of the visit, parental visitation had been prematurely suspended. There is of course substantial doubt that the suspension order would have been entered had the facts been more accurately disclosed to the court.
The road to termination went inexorably on. The parents did not appear at the next scheduled hearing in April 1989. Again, the giving of actual notice to them was not established. The April hearing resulted in yet another order continuing DYFS custody. In May 1989, the children's case was administratively transferred to the DYFS Adoption Resource Center and a third worker took it over. She sent a notice to the welfare hotel by certified and ordinary mail so advising the parents. The return *430 receipt card signature proved not to be T.C.'s handwriting. They denied receiving either piece of mail. The DYFS worker did not attempt any personal communication with them by either telephone or visit.
In July 1989, DYFS filed its complaint for termination and an order to show cause issued returnable in October. At the October hearing, R.Y.'s biological father appeared and voluntarily surrendered his parental rights. T.C. and I.R. did not appear at the scheduled morning session, and a default judgment of termination was entered. I.R., however, appeared in the afternoon and advised the court that he and T.C. both wished to contest the termination, but that T.C. was incarcerated, awaiting a probation violation hearing. The default judgment was vacated and the matter rescheduled for November 16, 1989. On that date the court appointed an attorney, present counsel, for each of them. The court also appointed a psychologist as the court's expert to evaluate the family members and make recommendations. No independent expert was appointed for the parents.
The contested hearing was conducted in June 1990 after preliminary hearings the previous March. In April 1990 T.C. gave birth to a healthy boy, I.R.'s son. The full hospital record, introduced into evidence, demonstrated that both she and the child were drug-free, she then claiming not to have used drugs for ten months.[1] With welfare's assistance, she obtained an apartment after the baby was born, and at the time of the hearing was waiting to be reunited with I.R., who could not leave the welfare motel and move in with her because of their understanding of welfare regulations. Both T.C. and I.R. testified at the June hearing. They had apparently managed to get their lives in order and all was well with the new baby. They wanted the two older children back.
*431 The judge, who rendered his decision the following October, expressed his satisfaction that the parents were now fit. Indeed, based on the psychologist's recommendation, the judge dismissed the termination complaint as to R.Y. and, subject to counselling and supervision conditions, ordered his return to T.C. and I.R.R.Y. had retained clear recollections of his mother, desired to be with her, and had not bonded to anyone else in the intervening two years since his removal from his mother's custody. The problem, however, was D.C., as to whom the psychologist had reported as follows:
D.C. is an intellectually handicapped child with behavior problems who has been in foster care for two years. She is bonded emotionally to her foster mother and appears to be making very satisfactory progress under her care. Removal of this child from her foster mother's custody would have a devastating psychological effect on her which would in all psychological probability manifest behaviorally as increased negativism and defiance, as well as regression in intellectual functioning and adaptive behavior skills. This is an emotionally fragile child whose capacity for relating to others, self-esteem, and basic trust would be very seriously harmed by separation from her foster mother. Further, it is likely that the behavioral regression that such a separation would produce would elicit negative parenting behaviors, possibly abusive parenting on [T.C.]'s part, should [D.C.] be returned to her.
While the trial judge rejected the prediction respecting T.C.'s possible reaction to D.C.'s possible "behavioral regression," he nevertheless accepted the expert's bonding views and found that:
[T]he loss in the child's mind of any relationship with her parents and the harm that would be done to the child if an attempt was made to remove her from the foster mother and the attempt was made to reunite her with people who are presently strangers to her mandate that the termination should be the result.
The judge was also satisfied that termination based on foster-parent bonding alone met the criteria of N.J. Div. of Youth & Family Serv. v. A.W., 103 N.J. 591, 512 A.2d 438 (1986). D.C. was then almost five years old. She is now almost six. The parents appealed.[2]
*432 The Supreme Court in A.W. dealt sensitively, eloquently and definitively with the "almost insoluble dilemma" produced by the tension between constitutionally protected parental rights on the one hand and the State's right, on the other, to intervene for the protection of children whose health and safety are seriously jeopardized. Id. at 599, 512 A.2d 438. The Court thus attempted to establish guidelines for resolving the dilemma, at least in those cases in which DYFS has removed children from their parents' custody and has concluded that protection of the children from serious harm precludes family reunification and requires termination of the parental relationship. The four-prong test developed by the Court requires DYFS to prove, by clear and convincing evidence, that:
(1) The child's health and development have been or will be seriously impaired by the parental relationship. Id. at 604, 512 A.2d 438
(2) The parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm. Id. at 605, 512 A.2d 438
(3) The court has considered alternatives to termination. Id. at 608, 512 A.2d 438
(4) The termination of parental rights will not do more harm than good. Id. at 610, 512 A.2d 438
The trial court here concluded, in essence, that termination was required because of the positive relationship of D.C. to her foster mother, not because of anything intrinsically negative in the relationship of D.C. with the biological parents who had nurtured her for the first two and a half years of her life. We are persuaded, however, that termination without implication of substantial parental fault and based exclusively upon foster-parent bonding during temporary placement goes beyond the *433 articulated standards of A.W. Thus, while we recognize that A.W. did suggest that serious psychological damage to the child could satisfy the first of these tests and while that suggestion was made in the context of the disturbing effect of parental visits upon the removed child, nevertheless in A.W. the cause of that disturbing effect was rooted in the prior parent-child relationship itself and was not simply due to the child's bonding to another after removal. Id. at 605, 512 A.2d 438
In addressing the foster-parent bonding question as an issue of first impression, we conclude that whatever validity a theory of termination based on such bonding alone might ultimately have, that theory was inappropriately applied in the circumstances here.
There is much that is disquieting about this case. Both T.C. and I.R. are obviously disadvantaged economically, educationally, socially, and, according to the expert, intellectually, and T.C. has in fact used drugs in the past. Nevertheless, it was the family's homelessness in March 1988 which triggered the family's breakdown and the need for DYFS intervention. While not directly in issue here, this case also demonstrates the kind of bureaucratic inefficiency, confusion, and fractionalization which can subvert the process of social service delivery into a frustrating and counterproductive experience for the intended beneficiaries of those services. This record strongly suggests that if the homelessness issue could have been resolved early on, this family might never have been separated or separated only briefly. But T.C. seems to have been caught between welfare and DYFS, was referred back to one by the other, and received help from neither. Indeed, her fear that DYFS would make good on what she perceived to be its threat of the loss of her children induced her to attempt to hide from it, and that in turn prejudiced her welfare entitlements. In short, she did not trust DYFS or any of the bureaucracies or systems with which she had to deal. She did not trust the court, which might have saved her from eviction in the first place. Obviously her *434 response to that mistrust was altogether counterproductive for her.
There are other ironies here as well. It seems likely that the money DYFS spent to keep R.Y. in a welfare motel with a succession of homemakers might well have been sufficient to obtain some kind of at least temporary affordable housing which would have kept the family together. It also appears that once the children were removed, T.C. might not have been qualified to receive welfare assistance for family housing. Indeed, according to her understanding, to which she testified, she finally received assistance in obtaining an apartment only because of the birth of the new baby in 1990.
The handling of this case by the first two DYFS workers causes us serious concern. It is reasonable to infer from this record that while they paid some lip service to their stated goal of family reunification, which continued until D.C.'s transfer to the Adoption Resource Center, they did little, if anything, to achieve that goal. It matters not whether that failure was caused by casework overload or by their personal conviction that D.C. would be better off if she were to be adopted by her foster mother as quickly as possible. In either event, their handling of the matter appears to have been antithetical to the reunification goal.
It is clear that at the very outset, T.C.'s complaint about her management difficulties with R.Y. was apparently viewed by the protective services worker as poor parenting. In fact, hyperactive children are notoriously difficult and impose serious strains on families able to cope far better than T.C.'s. Perhaps a more sympathetic response on that score would have made a difference. It is also difficult to understand why the worker accorded so much weight to the unreliable and apparently malicious information given by T.C.'s mother, who seems to have misled her from the outset by further suggesting that she would provide a home for her grandchildren. Investigation, including investigation of T.C.'s own DYFS history occasioned *435 by maternal abuse, would also perhaps have made a difference. Even more questionable is the protective services worker's almost total failure from the time of the initial removal of the children until the transfer of the case to the Adoption Resource Center to take any initiative to work toward family reunification, even by communicating with the parents to determine their present situation and their desire and ability to have the children returned. We also find it difficult to reconcile a stated goal of family reunification with the obvious self-defeat built into the November 1988 reunification plan, which was based, despite the steadily increasing foster-parent bonding, on a monthly supervised visit of an hour or two or with the worker's refusal to assist with transportation to the scheduled December visit. Furthermore, the never-explained absence from the file of the contact sheets describing the one positive November visit and the worker's misleading representations to the court respecting that visit and the parents' then expressed interest in the children are troubling indeed.
Perhaps most disturbing of all here is the issue of legal representation. Counsel was not appointed until well after the termination complaint was filed. According to the psychologist, the foster-parent bonding was by then well cemented. If that bonding alone were sufficient to result in termination, the appointment of Clarence Darrow himself would not have helped these parents regain their children. The representation which was afforded by assigned counsel here was, in fact, dedicated, effective and wholly admirable, but, under the expert's bonding thesis, too late by definition.
We are aware that had T.C. or I.R. appeared at the initial protective custody hearing or at any subsequent periodic review hearing, counsel would then have been assigned to them pursuant to N.J.S.A. 9:6-8.43, which requires the court to advise indigent parents of their right to have an attorney appointed to represent them. See, e.g., N.J. Div. of Youth & Family Serv. v. D.C., 118 N.J. 388, 571 A.2d 1295 (1990). But we also recognize that T.C. and I.R. are, as is true of so many in their *436 circumstances, particularly vulnerable, deeply disaffected and fearful, completely uninformed about their rights and how to defend them, and generally distrustful of the very system which can protect them. Moreover, having been assured by the first DYFS worker that the removal of the children would not result in their loss, they can hardly be charged with understanding that the clock had started ticking against them on the day D.C. was placed in her foster home. It is also clear that if T.C. and I.R. had counsel early on, the January 1989 order suspending parental visitation would, in all probability, never have been entered and this family would, in all probability, have long since been reunited.
While we cannot conclude, as DYFS argues, that the parents' non-appearance in these circumstances amounts to a waiver of their right to counsel, we also appreciate the practical difficulties presented to the court in attempting to protect the rights of parents who seem to be making no effort of their own to seek that protection. We are, however, persuaded that the fact of parents' non-appearance may, as here, be entirely inconsistent with the true state of their interest in and expectation of their children's return.
Because of the paramount significance of the interests involved in protective custody proceedings and particularly because of the risks inherent in a delay in family reunification, we are of the view that mechanisms must be considered to maximize the opportunity for the parents to obtain the necessary legal advice and assistance as early in the proceedings as possible. At the least the court must be satisfied that the parents have been adequately notified of the hearing, its purpose, and their right to have counsel appointed for them. Perhaps the statutorily required judicial advice respecting representation should be construed as requiring a written communication by the court to the parents explaining their right to counsel and assuring that appointed counsel would be acting exclusively and confidentially in their interests. Perhaps a personal communication should be attempted by an attorney designated by the court who would *437 then report back to it respecting the parents' reunification interest and intentions. In any event, we are persuaded that where, as happened here at the January 1989 hearing, the court is made aware that there has been recent parental interest counterindicating parental abandonment, it must be particularly solicitous in assuring the parents' constitutional due process rights. It is possible, of course, that this may be an isolated case. Our concern is that it should not be repeated in the future.
We make these observations in the context of a bonding-based termination to demonstrate that the creation of the foster-parent bonding here was due to circumstances in large measure beyond the control of the parents. It appears to have resulted more from the worker's attitude and actions combined with the nature of the bureaucratic process itself than from any culpability in respect of the children attributable to the parents.[3] In short, this separation, or at least a separation of any significant duration, may have been avoidable. The question, then, is whether, all of the foregoing notwithstanding, the bonding here justifies termination. Our answer is not yet, if at all.
We recognize that the only expert involved in this case had a firm commitment, as a matter of professional philosophy, to the view that bonding is of such signal importance in a child's mental health that irreparable psychological devastation results from the breaking of the bond. Indeed his view is so inalterable that he expressed the conviction, on cross-examination, that a child bound to her kidnapper might well be better off remaining with him than being returned to her parents. But there are other more moderated schools of psychological thought. See *438 Symposium: The Impact of Psychological Parenting on Child Welfare Decision-Making, 12 N.Y.U.Rev. of Law and Social Change, 485-589 (1984). Particularly instructive is this observation of Professor Peggy C. Davis, formerly a judge of the New York Family Court, who has this to say:
Professor Stack has given us a detailed exposition of the intricate relationships among extended kinship (and friendship) group members and the ways in which adults accept, and children thrive within, shared parenting arrangements. My experience indicates that similar relationships could be developed within the foster care system. Foster parents who are not alienated from biological families by extreme social class differences or restrictive agency policies against informal communication are able comfortably to allow the child a continued relationship with its biological family. This is likelier when the foster parents are motivated to value the role of participating in the nurturance of a child whether or not the child can be viewed as "their own." But compatibility between foster and biological families is often shattered when the law requires that one adult figure or the other be given an absolute "right" to the child.
My foray into the social science literature supports the conclusion that the concerns I had as I watched children and families pass through the family court reflect common and systemic problems. The literature concerning the effects of separation is not sufficiently conclusive to allow us to be confident that we have avoided certain harm, and therefore done the right thing, when we decline to remove a child from surrogate care simply or primarily for the sake of avoiding a second custodial change. The literature suggests that the wishes of children to maintain biological ties ought not be disregarded as expressions of unrealistic reunion fantasies. It suggests that we should instead be attentive to the needs of all children  those who express a wish to maintain biological ties and those who do not  to avoid an unhealthy repression of the pain of severing the original family bond.
[Footnotes omitted] [Id. at 571]
Common experience, moreover, suggests numerous instances of rebonding after extended parental separations caused, for example, by lengthy illness, war, emigration, incarceration or other convulsive family upheaval.
We further note that the value of maintenance of biological family ties is now a matter of legislatively expressed public policy. P.L. 1991, c. 290, adopted on September 23, 1991, codified as N.J.S.A. 9:6B-1 to -6, and entitled the "Child Placement Bill of Rights," accords children placed outside the home by a public service agency these, among other, rights:
a. To placement outside his home only after the applicable department has made every reasonable effort, including the provision or arrangement of *439 financial or other assistance and services as necessary, to enable the child to remain in his home;
b. To the best efforts of the applicable department, including the provision or arrangement of financial or other assistance and services as necessary, to place the child with a relative;
c. To the best efforts of the applicable department, including the provision or arrangement of financial or other assistance and services as necessary, to place the child in an appropriate setting in his own community;
d. To the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home;
e. To visit with the child's parents or legal guardian immediately after the child has been placed outside his home and on a regular basis thereafter, and to otherwise maintain contact with the child's parents or legal guardian, and to receive assistance from the applicable department to facilitate that contact, including the provision or arrangement of transportation as necessary;
f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his sibling upon placement outside his home, including the provision or arrangement of transportation as necessary; [N.J.S.A. 9:6B-4]
Scrupulous adherence to these rights of the affected children, all of which have been previously recognized in this jurisdiction, might have kept this family intact or at least might have minimized the period of the separation.
Our point is this. We recognize not only the constitutional imperatives underpinning the preservation of the natural family relationship[4] but also the intrinsic value to parents, children and siblings of maintaining the biological family intact. As we said in Matter of Guardianship of J.E.D., 217 N.J. Super. 1, 15-16, 524 A.2d 1255 (App.Div. 1987), "[a] final separation from a biological parent is a harm in itself ... Experts are increasingly concerned about the seriousness of this loss and are recognizing the need for continued contact with a biological parent, even a flawed parent ... Our courts have recognized that a child's relationship with a parent is of such significance *440 that doubts are to be resolved against its destruction." [citations omitted]
We also believe that the judicial recognition of psychological bonding which underlay the parental termination decisions in Sorentino v. Family and Children's Soc'y of Elizabeth, 72 N.J. 127, 367 A.2d 1168 (1976) and Sees v. Baber, 74 N.J. 201, 377 A.2d 628 (1977), both adoption cases, may have been moderated by Matter of Baby M, 109 N.J. 396, 428, 537 A.2d 1227 (1988), in which the Court insisted that "termination of parental rights will not be granted in this state absent a very strong showing of abandonment or neglect."
We are persuaded that the constitutional, social and psychological force of these conjoined principles ordinarily weighs heavily against parental termination based on the foster-parent bonding of a child whose biological parents are fit to have her returned to them, particularly in those cases in which the parent-child separation has been substantially contributed to by public agencies whose mission it is to protect the family. We cannot, on this record and considering the conflicting literature, reject the thesis that in particular circumstances, foster-parent bonding may justify parental termination in order to spare the child grievous and irreparable psychological harm. But on the other hand, we are also not satisfied, on this record and considering the conflicting literature, that foster-parent bonding was, in this case, clearly and convincingly demonstrated to have supervened all other concerns.
We recognize that the expert here did predict that such irreparable harm here would ensue if D.C. were returned to her parents and that he did reject the notion of her ability to rebond to them without suffering harm. But his testimony, as we have noted, reflected a strong professional bias which minimized the intrinsic value of biological family ties and failed to take into account any potential success of D.C.'s gradual transition back to her parents' custody or even the possibility of her remaining in her foster mother's custody with regular parental *441 visitation. Cf. Matter of Guardianship of R.O.M.C., 243 N.J. Super. 631, 581 A.2d 113 (App.Div. 1990). Indeed, on the issue of D.C.'s continued visitation with her parents, he expressed the view that such visits would be pleasant for her, the danger being however in her ultimate perception that they signalled a threat to her foster-parent relationship. In short, we are satisfied that the A.W. test of a lack of alternatives to parental termination was inadequately addressed by reason of the absence from this trial of an expert to speak to the parents' interest and by reason of the absence of any effort at all to reestablish a parental relationship.
For these reasons, fairness to the child, the parents and the process itself requires us to remand for further proceedings. First, the trial judge shall afford the parents a psychiatric or psychological expert of their choosing to evaluate all the family members as well as the foster mother. The expert shall make recommendations to the court respecting the feasibility of the reestablishment, by extensive visitation and by counselling of the family members, of a parental relationship between D.C. and her biological parents and a sibling relationship between D.C. and her brothers. The expert's recommendation shall also consider the extent and duration of the continuance of the foster-parent relationship, whether custody should remain for any period of time with the foster parent, and if so, a plan for visitation with the biological family during that period. Thus, the expert shall consider, if the circumstances so require, the feasibility and desirability of this child continuing, for a time at least, as a member, on some basis, of two separate family units. It may also be that the parents' expert would be of the view that any contact between D.C. and her biological family would cause her irreparable serious harm. In any event, the court shall, in the light of the principles here expressed, review its termination order based on the expert opinions testified to on the remand and the parties' present circumstances. He shall also make any other interim order respecting visitation, counselling or any other matter as he deems appropriate.
*442 The order terminating the parental rights of T.C. and I.R. to D.C. is reversed, and we remand for further proceedings consistent herewith to be undertaken with all practical expedition.
SHEBELL, J.A.D., concurring.
I have no quarrel with the course followed by DYFS in this case. The agency was faced with a most difficult situation, not of its own making, but rather, caused by the failure of T.C. and I.R. to carry out the most fundamental of their parental responsibilities.
Nonetheless, the proofs demonstrate that the picture had brightened considerably by the time the case came on for trial before the Family Part. At that time the judge should not have, on the proof presented, granted termination. It could not then be said that clear and convincing evidence supported a finding that the parents were unable or unwilling to eliminate the harm, or that the health and development of the children would be seriously impaired by continuing the parental relationship. New Jersey Div. of Youth & Family Serv. v. A.W., 103 N.J. 591, 604-05, 512 A.2d 438 (1986). Therefore, I also would reverse the order terminating parental rights. However, I would remand the matter to the Family Part only for such further proceedings as may be initiated by the respective parties.
NOTES
[1] The drug testing was done at DYFS' behest. T.C. testified that DYFS had "put a hold" on the baby for that purpose, thereby delaying his hospital discharge.
[2] We would be remiss in not commenting on the inordinate length of time, some fifteen months, from the completion of the hearing to the calendaring of this case on appeal. Although we understand the palpable struggle of this conscientious trial judge in dealing fairly and properly with the difficult competing interests here involved, the four-month delay in decision, given his bonding rationale for termination, was nevertheless unfortunate. Moreover, we understand from the record that by October 1990 the transcripts had already been ordered and obtained under the Appellate Custody and Termination System [ACTS]. The perfection of the appeal should have been accelerated as well and months should not have gone by before the briefs were filed. Such cases must, in the future, be more carefully monitored.
[3] Another sad commentary here is the extent to which the combination of circumstances must surely reinforce the fear of alienated desperate parents that to seek DYFS' help in critical situations is to risk the loss of their children. Parents obviously must be encouraged to, not discouraged from, seeking that help.
[4] See, e.g., Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).