# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3802-16T4
                    A-3803-16T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

S.R. and R.S.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.S., a Minor.

_____

Argued October 1, 2018 – Decided October 9, 2018

Before Judges Fasciale and Gooden Brown.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0079-16.

Matthew Van Natten, Designated Counsel, argued the cause for appellant S.R. (Joseph E. Krakora, Public

Defender, attorney; Stephen P. Dempsey, Designated Counsel, on the brief).

Ryan T. Clark, Designated Counsel, argued the cause for appellant R.S. (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Viviane C. Sullivan, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Viviane C. Sullivan, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel C. Devlin, on the brief).

PER CURIAM

In these consolidated appeals, S.R. (the mother) and R.S. (the father) (collectively defendants) appeal from an April 21, 2017 order terminating their parental rights to their son M.S. (the child), born in 2014. Judge Richard M. Freid entered the order and rendered a comprehensive forty-six page written opinion. Defendants contend primarily that the Division of Child Protection and Permanency (the Division) failed to sustain its burden of proof. We disagree and affirm.

The mother has substance abuse and mental health issues. In 2014, the Division received a referral from St. Joseph's Hospital, reporting that the mother

gave birth to the child. The mother only had two prenatal visits, and approximately one month before the child's birth, and on the day she gave birth to the child, the mother tested positive for PCP. The Division substantiated the mother for neglect, and executed an emergent Dodd removal of the child upon his discharge from the hospital. The Division placed the child in a foster home, where he is thriving and has remained ever since.

The Division attempted to locate the father immediately after the mother identified him, but was unsuccessful. In March 2015, a Division worker met the father while at the mother's residence, but he left abruptly and would not provide the worker with a telephone number or address. In April 2015, the police arrested the father and charged him with aggravated assault on a probation officer. A judge later sentenced the father to prison.

At the FG trial, Division caseworker Jeanette Suarez testified and described the Division's involvement with the mother, father, and child, including the issues that led to the child's removal, and the efforts the Division took to provide the parents with services. Dr. Robert Kanen, an expert in psychology, also testified for the Division. The father also testified. Judge Freid made detailed findings of fact and concluded that the Division proved by clear and convincing evidence all four prongs of the best-interests standard.

Parents have a constitutionally-protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests.

To obtain parental termination, N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

4

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

The scope of this court's review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 413 (1998). "When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings, which undergird such a judgment, "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that

5

logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

The mother contends that she did not harm the child. She contends that at the time of the child's birth, he was born without PCP in his system, and that there were no signs of withdrawal symptoms. The first prong under the best-interests test focuses on whether the child's safety, health or development has been or will continue to be endangered by the parental relationship. The Division must prove that the child's health and development has been threatened and will continue to be affected by the parent-child relationship. K.H.O., 161 N.J. at 348. The focus is not on a single or isolated event, but rather on "the effect of harms arising from the parent-child relationship over time on the child's health and development." Ibid. However, the court does not need to wait "until a child is actually irreparably impaired by parental inattention or neglect" to find child endangerment. In re Guardianship of DMH, 161 N.J. 365, 383 (1999) (citing A.W., 103 N.J. at 616 n.14).

The judge found that the mother harmed the child by forcing the child into the foster care system. Judge Freid noted the mother's long history with the Division, which dates back to 2008. He pointed to the mother's lack of custody of her three older children, her inability to maintain stable housing, and her

history of unemployment. The judge further found that the mother placed the child at risk of harm during her pregnancy by receiving limited prenatal care and "continuing to actively use especially dangerous illicit substances and continued to harm [the child] and to place him at risk of harm by continuation of that process even after his birth."

There exists substantial credible evidence in the record to support the judge's finding that the Division met prong one under N.J.S.A. 30:4C-15.1(a). The mother delivered the child after testing positive for PCP, she had limited prenatal care, and the Division removed the child due to the mother's use of drugs. Since the child's birth, the mother has consistently tested positive for PCP and has failed to complete any drug program. Dr. Kanen, the only expert to testify at the trial, found the mother to be self-centered and primarily focused on her own needs. According to Dr. Kanen, PCP is a "highly dangerous drug" and "[a]ny child under her care at this time would be at risk of harm." Dr. Kanen opined that the mother's prognosis for change was poor; she is "unpredictable, inconsistent, and irresponsible," and she would have difficulty supporting herself or her child.

The father contends that the Division failed to meet prong one under N.J.S.A. 30:4C-15.1(a) because it did not prove that his incarceration harmed

7

the child.  The father relies on In re Adoption of Children by L.A.S., 134 N.J. 127, 136-37 (1993), in which our Supreme Court concluded that a parent's incarceration is a relevant factor in a termination proceeding, but it does not justify termination as a matter of law.  In L.A.S., the Court reasoned that the two major grounds that justify termination are abandonment and unfitness.  Id. at 134.  The father further argues that a showing of abandonment requires a "broad inquiry" that is "extremely fact sensitive" surrounding the relationship between the parent and child before and after incarceration.  R.G., 217 N.J. at 554-55. The father contends that the judge failed to conduct the fact-sensitive broad inquiry required to terminate his parental rights, and the judge's "vague assertion" of harm stemming from his incarceration was insufficient.  The father contends that he engaged with the Division and was capable of taking care of his child.

The judge found the father failed to cooperate with the Division at all during the first five months of the child's life.  The Division called the father during that time, but he would hang up on the Division worker when she announced herself and the purpose for the call.  The judge also noted that the father "shrugged them off" when the worker happened to meet the father at the mother's house, and that he left without getting any information.  The judge

found that up until the father's incarceration, he "actively avoided all contact with the Division and the [c]ourt." The judge further found that the father harmed the child by avoiding the Division and by failing to provide the child with a safe and stable home, which also led to the child's placement with the foster parents.

Therefore, there exists substantial credible evidence in the record to support the judge's finding as to the father under prong one. Contrary to the father's contention, the judge did not support his findings under prong one solely on the father's incarceration, but he also considered the father's avoidance of the Division during the first five months of the child's life. The father has admitted to two felony convictions, beginning with a conviction for robbery in 2005. At the time of the FG litigation, the father was in prison for aggravated assault on a probation officer. According to Dr. Kanen's psychological evaluation, the father "assumes a passive role in most relationships," and "[h]e shows a striking lack of initiative and a general avoidance of independence is notable." Dr. Kanen further opined that the father "has severe parenting deficits and has no insight into these deficits . . . . He is irresponsible, fails to plan ahead and fails to learn enough from experience to be arrest free."

The mother contends that the judge did not acknowledge her efforts to treat her dependency issues, despite the limits placed on her due to her homelessness and mental health issues. She argues that the judge did not give enough weight to the fact that the mother requested the Division's services in obtaining job training to become a home health aide, or the fact that she is currently employed as a security guard. She relies on this court's decision in N.J. Div. of Youth & Family Servs. v. L.W., 435 N.J. Super. 189, 196 (App. Div. 2014), in which we concluded that it is important for "impoverished, homeless" parents to feel free to call the Division "in times of need, without fear of being found neglectful . . . ."

But the mother's reliance on this case is misplaced. She asserts that the Division did not provide her with assistance in getting independent living accommodations, and her situation could not change without the Division's assistance. But in L.W., we were encouraging mothers to reach out to the Division, without fear of being found neglectful. Ibid. Also, the mother fails to acknowledge the Division's referral to Eva's Village Shelter, which she left voluntarily after testing positive for PCP and being given the choice to go to an inpatient facility or leave.

A-3802-16T4

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent . . . is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The relevant inquiry for the trial court is whether the parent has cured and overcome the initial harm that endangered the child, and "is able to continue a parental relationship without recurrent harm to the child." K.H.O., 161 N.J. at 348.

As to the mother, the judge found that despite the Division's efforts to provide her with services, she is unable or unwilling to correct the issues that led to the child's removal. The judge did not rely solely on the mother's failure to obtain stable housing. He specifically noted Dr. Kanen's opinion that the mother could not articulate a plan for reunification with the child. The judge considered the mother's almost decade long history with the Division and her "serious substance abuse," which has been an issue throughout the last ten years. The judge found that "there is no reasonably foreseeable basis" the situation would change, noting that even throughout this litigation, the mother has refused to engage in the recommended substance abuse treatment. The judge acknowledged the mother's current employment, but found that the "very brief period of employment is heavily outweighed . . . by the long history of being

11

unemployed, and so regular, continuing employment is certainly not to be presumed for the future." The judge pointed to the mother's inability to establish independent, appropriate housing. And throughout the litigation, the mother failed to attend evaluations, failed to complete any substance abuse treatment program, and failed to submit to urine screenings. She was discharged from several parenting and visiting programs because of her noncompliance with the programs' rules. Despite the Division's attempts, the mother has consistently shown her unwillingness or inability to eliminate the harm facing the child if he were returned to her custody.

The father contends that the trial judge did not engage in the required fact-sensitive inquiry and that his repeated attempts to maintain contact and visits with the child contradict the judge's finding that he is unable or unwilling to eliminate the harm that has endangered the parental relationship. He asserts that the visits were "good" and he and the child would "have fun, and laugh together." The father also notes his "model behavior" in prison, which he asserts demonstrates his willingness to eliminate his incarceration and parent the child.

As to the father, the judge focused on his active avoidance of the Division after the child's birth, and his incarceration. The judge did not find the father's testimony credible. The judge acknowledged that incarceration does not justify

termination of parental rights as a matter of law, but reasoned that the father had no relationship with the child even before his incarceration, "[i]n fact, he shunned his parental obligations and avoided both the Division and the [c]ourt."

There exists substantial credible evidence to support the judge's finding that the Division met its burden as to the second prong of the best-interests test. As the judge found, the father's testimony was not credible, and the father was actively avoiding the Division and the court. The father could have engaged with the Division after meeting a Division worker at the mother's residence, but he did not do so. The father's avoidance in the first five months of the child's life contributed to the child's placement with foster parents. The father has been incarcerated for most of the child's life. Moreover, Dr. Kanen opined that the father "cannot provide this child with a permanent, safe and secure home and has had very limited involvement with his son." When asked where he plans to live after his release from prison, the father stated, "I will be homeless I guess."

The mother contends that the Division predetermined, shortly after the child's birth, to permanently remove the child from the mother and have the child adopted by non-family foster parents. She further argues that the Division did not fully explore placement of the child with the mother's stepsister. Lastly, the

mother asserts that the Division did not provide services tailored to the mother's housing needs and mental health issues.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007). However, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success." DMH, 161 N.J. at 393.

The judge found that the Division "has made more than reasonable efforts to correct the circumstances which resulted in the removal of [the child] and the institution of this litigation." The judge referred to two doctors, Dr. Gentile, who conducted a psychiatric evaluation, and Dr. Kanen, who conducted a psychological evaluation. Both doctors concluded that the mother's prognosis for sobriety is poor and doubtful, and that her condition may be "irreversible." The judge noted the Division's continued efforts to provide the mother with

services, but her avoidance of the programs, or noncompliance with them, which would result in her discharge. The judge explained the Division's attempts to provide the mother with housing programs, such as Eva's Village Shelter, from which she was discharged for failure to comply with treatment, and her involvement in an altercation with another resident. The judge also noted the Division's attempts to provide her with mental health services, which were specifically geared toward substance abusers.

As is evident from the judge's opinion, there exists substantial credible evidence that the Division provided the mother with multiple reasonable services, throughout the current litigation (and even its involvement with the mother for her other children). The Division provided her with services at Eva's Village Shelter, multiple substance abuse assessments, programs for parenting training and visitations, and a program to receive individual psychotherapy. Despite the mother's contention, the judge found that the Division properly considered and ruled out the family members put forth by the mother and father, including the paternal aunt, maternal uncle, and mother's stepsister. As to the stepsister, she lived in an apartment with bars on the door and windows, which posed a safety hazard.

The father contends that the Division did not provide a single meaningful service to him. He further asserts that the Division did not provide reasonable services for visitation with the child. He relies on our Supreme Court's decision in DMH, in which the Court held that the Division must "foster and maintain the bond between the parent and child as a basis for the reunification of the family." 161 N.J. at 390. The father also points out the Division's own regulations, which state that frequent and long visits are beneficial for most children placed out of the home. He also cites to our Supreme Court's decision in N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 178 (2010), in which the Court noted that the Division limited the father's visits with his son both in respect of frequency and time and called the one-hour-per-week-supervised visitation "paltry."

The father's reliance on I.S. is misplaced. In I.S., the Court reasoned that "[i]n a case . . . where the parent is identified and located after the initial placement of the child, there is no viable reason a schedule of reasonable visitation was not established immediately or within a very short period of time." Ibid. This case is distinguishable; the father fails to acknowledge the fact that he was not immediately located upon placement of the child with the foster parents. As the judge found, the father actively avoided the Division and did not attend the court hearing that a Division worker told him about. Moreover,

16

he does not take into consideration that at the time the visitation began, he was incarcerated.

The judge found that the Division "had a substantial opportunity to try to work with [the father] from [the child's] birth until his incarceration," but he went missing and avoided the Division and the court. The judge further found that when the Division finally found the father in prison, the Division met with him and provided him with genetic testing – as he requested – and engaged with prison authorities so the visitations could begin. The judge found that the Division provided the father with visitation and a psychological and bonding evaluation, but they were unable to provide other services, such as anger management programs, because they were constrained by the rules of the prison.

There exists substantial credible evidence that the Division met prong three and made reasonable efforts to provide services to help the father correct the circumstances which led to the child's placement outside of the home in the first place. As the judge correctly noted, the Division could have provided the father with more services if he had immediately engaged with the Division after learning about the birth of his son – prior to his incarceration. Moreover, the Division provided the father with services that were available under the circumstances, such as a psychological and bonding evaluation, and visitations

A-3802-16T4

with the child. The Division attempted to provide the father with more services, but was unable to because of the prison's policies. Yet, the father did receive a parenting skills class after signing up for it himself. Despite the father's contention that the Division could have contacted the prison to move the father's name higher on the waiting list for services, Ms. Suarez, the Division caseworker, testified that in her contact with the prison, it was clear to her that the prison would determine when the services would be rendered.

The mother does not contest the judge's finding on prong four, but the father contends that the record is "filled with many positive interactions between [the child] and [the father]." He argues that throughout the litigation the father has made it clear to the Division that he wants to be part of the child's life and play a parental role. In support of his argument, the father notes the first time a Division worker visited him in prison and he told the Division worker that he wanted to be part of the child's life. He also points to the times when the father accompanied the mother to her visitations with the child. He notes that the foster mother stated that a visitation between the father and the child "did go very well" and the father "was appropriate." The father also relies on Dr. Kanen's opinion in which he described the father as "logical" and "coherent" and did not see any evidence of mental illness.

The father relies on this court's decision in N.J. Div. of Youth & Family Servs. v. T.C., 251 N.J. Super. 419, 439 (App. Div. 1991), in which the court observed that "[a] final separation from a biological parent is a harm in itself . . . ." (alteration in original). Moreover, the father relies on our Supreme Court's decision in In re D.C., 203 N.J. 545, 576 (2010), where the Court noted that "under the best of circumstances, adopted children experience more emotional stressors than their non-adopted peers." The father notes the foster parents' recognition that the child "will struggle with being 'different' when he grows up."

Under the fourth prong, the court must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than the permanent disruption of [his] relationship with [his] foster parents." K.H.O, 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012).

The judge was "firmly convinced" that the child did not have a secured bond with the father and that the father "shunned the opportunity to begin to

create one by his intentional shunning of both the Division and the [c]ourt, . . . and that any attempt at finally starting one in prison, was completely unsuccessful due to the environment they had to be conducted in." The judge noted the fact that Dr. Kanen had to end the bonding evaluation between the child and the father after a few minutes because of the child's extreme distress. The judge balanced whether the child would suffer a greater harm from the termination of the parental rights of the natural parents than from the permanent disruption of a relationship with the child's foster parents. He also considered Dr. Kanen's expert opinion as to the child's need for permanence and the child's secured attachment to his foster parents, who the child has been with since the child was three days old.

Substantial credible evidence exists to support the judge's finding that the Division met its burden under prong four. The Division provided Dr. Kanen's expert opinion as to the relationship between the child and the biological parents and the child and the foster parents. Although, as the father noted, one of the visits between the father and the child "did go very well," it is not enough. According to Dr. Kanen, during the bonding evaluation between the father and the child, the child became so distressed that he had to end the evaluation. The child was "screaming and crying" and "could not be settled down or comforted

. . . ." Dr. Kanen concluded that there is no attachment between the father and son. The father's assertion that there were positive interactions between the father and the child does not negate Dr. Kanen's expert opinion as to the lack of attachment.

Furthermore, during the bonding evaluation of the child and the foster parents, Dr. Kanen observed that the child was "well-related" to the foster parents; the child was "happy" and "comfortable with physical closeness." Dr. Kanen concluded that the child "is securely attached to the foster parents" and if the child was removed from their care, the child would be "severely traumatized."

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3802-16T4