997 A.2d 1010 (2010)
414 N.J. Super. 56
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
D.M., Defendant-Appellant.
In the Matter of the Guardianship of S.M., a minor.
DOCKET NO. A-6020-08T4.
Superior Court of New Jersey, Appellate Division.
Argued March 23, 2010.
Decided June 11, 2010.
*1011 Carleen M. Steward, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney, Ms. Steward, on the brief).
Lea C. DeGuilo, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. DeGuilo, on the brief).
Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor S.M. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Ms. Vance, on the brief).
Before Judges SKILLMAN, FUENTES and GILROY.
The opinion of the court was delivered by
GILROY, J.A.D.
On remand, the trial court entered an order terminating the parental rights of D.M. and F.M., the biological mother and father, respectively, to S.M., their daughter born September 2001. D.M. appeals, but F.M. does not.
The issue presented on appeal is whether a parent's parental rights may be terminated when the New Jersey Division of Youth and Family Services (DYFS or Division) fails to prove all prongs of the best interests of the child standard, but nevertheless, the child may suffer serious psychological or emotional harm by severing the bond between the child and his or her foster parents. We conclude that any harm the child may suffer from severing that bond cannot, in and of itself, serve as a legally sufficient basis for termination of the parent's parental rights. We hold that in such a case, DYFS must still prove by clear and convincing evidence that the parent's actions or inactions substantially contributed to the forming of that bond to where any harm caused to the child by severing the bond rests at the feet of the parent. Because we find an absence of that proof, we reverse and remand for *1012 further proceedings consistent with this opinion.
Because the procedural history and statement of facts were discussed at length in our prior consolidated unreported opinion, Division of Youth & Family Services v. D.M., Nos. A-6125-06 and A-6128-06 (App.Div. August 11, 2008) (slip op. at 2-37), it is unnecessary for us to fully detail them here; rather, a summary of the procedural history and statement of facts will suffice to place this appeal in context. However, before stating that summary, it is appropriate to review the general legal principles governing termination of parental rights.

I.
"[T]he right of parents to raise their children is a fundamental one of constitutional magnitude." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007). That right, however, is not without limits. In re K.H.O., 161 N.J. 337, 346-47, 736 A.2d 1246 (1999). Rather, the parents' rights "must be balanced against `the State's parens patriae responsibility to protect the welfare of children.'" N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 294-95, 914 A.2d 1265 (2007) (quoting In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992)). "[P]resumptions of parental unfitness may not be used in proceedings challenging parental rights and all doubts must be resolved against termination." G.L., supra, 191 N.J. at 606, 926 A.2d 320.
To terminate parental rights and obtain guardianship of a child who has been placed in foster care, DYFS may file a complaint under N.J.S.A. 30:4C-15(c) alleging that termination is in "the best interests" of the child, or under subsection 15(d) alleging that the parents abandoned the child. In re Guardianship of K.L.F, 129 N.J. 32, 36-37, 608 A.2d 1327 (1992). Where the complaint is brought under the best interests of the child section of the statute, "[g]uardianship cannot be awarded... unless the court itself determines that it is in the child's best interests under N.J.S.A. 34:4C-20." Id. at 37, 608 A.2d 1327. Such actions require proof by clear and convincing evidence. N.J. Div. of Youth & Family Servs. v. C.M., ___ N.J. ___, ___, ___, A.2d ___ (2010); (slip op. at 30); N.J. Div. of Youth & Family Servs. v. L.C., 346 N.J. Super. 435, 439, 788 A.2d 330 (App.Div.2002).
Termination actions brought under N.J.S.A. 30:4C-15.1(a) are decided under a four-prong "best interests of the child" standard, first enunciated by the Court in New Jersey Division of Youth & Family Services v. A.W., 103 N.J. 591, 604-11, 512 A.2d 438 (1986), and now codified in N.J.S.A. 30:4C-15.1(a). Under that standard, parental rights may be terminated only when:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
[N.J.S.A. 30:4C-15.1(a).]
*1013 The "four [prongs] enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. With these principles in mind, we now state the summary of the procedural history and statement of facts leading to this appeal.

II.
The Division first became involved with D.M. and her family in June 2004, when it received a referral concerning an alleged incident of domestic violence between D.M. and F.M. During his involvement with D.M., caseworker Nicholas Mangold learned that D.M. suffered from multiple sclerosis and took medication for the illness. She also suffers from severe scoliosis. Although Mangold responded to several other referrals between June and October 2004, he never substantiated abuse or neglect by either parent.
On March 28, 2005, another DYFS caseworker transported D.M. to the Morris County Courthouse to obtain a temporary restraining order against F.M. Because the caseworker observed what she described as D.M. displaying "inappropriate and bizarre behavior," DYFS removed S.M. from her parents' care that day. On July 12, 2005, following a fact-finding hearing, the court found that D.M. had placed S.M. at risk for abuse and neglect because of D.M.'s emotional instability and erratic behavior. On the same day, the court ordered DYFS to return S.M. to the family home to the physical custody of D.M.'s mother.
On August 23, 2005, DYFS removed S.M. from the family home a second time after learning that D.M.'s mother had left S.M. in the care of D.M. who DYFS believed was unable to properly care for the child because of health issues. On that day, the court entered an order placing S.M. into foster care with Mr. and Mrs. H., where S.M. has remained since. Mr. and Mrs. H. have three children: two girls, ages nine and eleven; and a boy, age five.
On August 23, 2006, DYFS filed a guardianship complaint seeking to terminate the parents' parental rights. The matter was tried over four days in May 2007. Much of the case centered around the parties' experts.
Dr. Rachel Jewelewicz-Nelson, a psychologist, testified on behalf of DYFS. Dr. Jewelewicz-Nelson determined that D.M. and F.M. "would not be able to parent S.M. in the reasonably foreseeable future" and that "S.M. would be harmed if she were to wait any longer for permanency." D.M., supra, slip op. at 18. The doctor concluded that S.M. should be "`freed for adopting by her foster parents.'" Id. at 15.
Dr. Frederica Brown, a psychologist, testified on behalf of the Law Guardian. Although Dr. Brown determined that S.M. was "happier" with her biological parents than with her foster parents, she did not recommend reunification. Id. at 21. Instead, the doctor "advocated for an `open adoption' with some `monitored supervision with the parents.'" Id. at 23.
Dr. Susan Herschman, a psychologist, testified on behalf of D.M. and F.M. Dr. Herschman determined that a strong bond existed between S.M. and her parents, but that S.M. also "`feels comfortable'" with her foster parents. Id. at 25. The doctor "opined that termination of parental rights would do more harm than good, based upon the bond she observed between S.M. and defendants, and the fact that there had never been `any obvious abuse or neglect of [S.M.].'" Ibid. Ultimately, Dr. Herschman concluded that with additional services provided to S.M. and her biological parents, reunification would be successful. Id. at 26. After *1014 finding the opinions of Drs. Jewelewicz-Nelson and Brown more persuasive than that of Dr. Herschman, the trial court entered an order on May 22, 2007, terminating D.M.'s and F.M.'s parental rights. Both parents appealed.
We reversed, determining that DYFS had "failed to present clear and convincing evidence that S.M.'s `safety, health or development' has been or will continue to be endangered by the parental relationship," as required by N.J.S.A. 30:4C-15.1(a)(1). Id. at 39. We concluded that "[i]n the absence of such proof, termination of appellants' parental rights was improper." Id. at 39-40. In reaching that conclusion, we "noted, the `conduct' upon which the trial judge relied in weighing the first statutory factor was F.M.'s drug abuse history, D.M.'s multiple sclerosis, and some domestic violence incidents between appellants." Id. at 45-46. However, as stated infra, we determined that "there [was] no clear and convincing evidence of record that any such conduct `endangered' S.M." Id. at 50.
We also concluded that the trial court erred in finding that DYFS had satisfied the second and fourth prongs of the best interests of the child standard. Id. at 47-51. As to the fourth prong, we stated:
S.M. has been in her current foster care placement since August 23, 2005. We are, therefore, mindful that our reversal of appellants' termination order will require additional proceedings in the Family Part. We note that the trial evidence of S.M.'s bonding with her foster parents was mixed, at best. By contrast, as noted, all experts acknowledged that S.M. maintained a loving relationship with appellants. Dr. [Jewelewicz-Nelson] described S.M. as "very quiet and very constricted" during the bonding evaluation with the foster parents. The doctor emphasized S.M.'s need for permanency because, "for almost two years[,]" the child "has been living with a sense of uncertainty and lack of affiliation[.]"
Defendants may have "personality deficits that have a negative impact on their capacity to parent[,]" as Dr. [Jewelewicz-Nelson] opined in her report. Notwithstanding these deficits, the record contains evidence of a strong loving bond between S.M. and her natural parents as well as evidence of the lack of such a bond with her foster parents. Once again we note the lack of any evidence of abuse, neglect or endangerment of S.M. resulting from her parents' "personality deficits[.]"
Dr. Brown testified that S.M. showed no "enthusiasm" towards her foster mother; they engaged in no eye contact and no make[-]believe play which the doctor regarded as "not a good sign." Dr. Brown described S.M.'s foster care placement as a "caretaker arrangement" and recommended it "in the absence of something better[.]"
On remand, the Family Part must examine the present state of S.M.'s bond to her foster parents as well as appellants' current situation. We have concluded that there is not clear and convincing evidence to support the decision to terminate appellants' parental rights. "That does not mean, however, that termination may not be an appropriate resolution." J.C., supra, 129 N.J. at 25, 608 A.2d 1312. If DYFS presents "substantial evidence of the harm that may come to [S.M.] if separated from [her] foster parents[,] ... that evidence may not be disregarded, even though, as the record now stands, it does not meet the strict statutory and constitutional standards that govern the termination of parental rights." Ibid.

If, however, DYFS is unable to offer clear and convincing evidence that, at *1015 present, "moving [S.M.] ... will, to a reasonable psychological certainty, cause serious harm," In re K.L.F., 129 N.J. 32, 44-45, 608 A.2d 1327 (1992), then appropriate steps must be taken to return S.M. to her natural parents. "The standard is not that the end result cause no pain or trauma but that the child be kept from [her] parents only to avoid serious and lasting harm." Id. at 45, 608 A.2d 1327.. "We are compelled to note that much of the bonding that has taken place in this case could have been avoided if" S.M. had not been improperly removed from appellants' custody in the first place. Ibid.

[Id. at 50-52.]
Accordingly, we remanded to conduct an expeditious evidentiary hearing as to whether S.M. had bonded with her foster parents, and if that question was affirmatively answered, to further determine whether the breaking of that bond would cause the child serious psychological or emotional harm. Id. at 52. We also directed the trial court to evaluate the biological parents' current situation and the present relationship between them and S.M. Id. at 51-52. Recognizing that S.M. last visited with her parents on June 12, 2007, when she was permitted a "goodbye" visitation following the trial court's order terminating parental rights, we directed the court on remand to permit D.M. and F.M. to have sufficient visitation with their daughter for the experts to determine the relationships between S.M. and her biological parents and between S.M. and her foster parents. Ibid.
On remand, the court entered orders directing that D.M. and F.M. undergo psychological evaluations, S.M. undergo therapy, DYFS permit TSVP[1] supervised visitation between S.M. and her parents, and bonding evaluations be conducted of S.M. and her biological parents and of S.M. and her foster parents.[2] D.M. attended visitation sessions on a weekly basis with her daughter between February 24 and April 21, 2009.
At the Division's request, Dr. Jewelewicz-Nelson conducted bonding evaluations between S.M. and members of her foster family on December 8, 2008. The doctor also conducted a psychological evaluation of D.M. on February 17, 2009, and March 3, 2009, and a bonding evaluation between D.M. and S.M. on April 1, 2009. The doctor opined that "[S.M.] is definitely emotionally bonded to her foster family" and that her "bond with her foster parents has increased and strengthened since" her last evaluation approximately one year prior. She opined that adoption was appropriate and in S.M.'s best interests because "[t]he psychological and emotional risks to [S.M.] should she not be adopted [by her foster family] are significant." She stated that S.M. "does not have a relationship with [her biological parents] that is based on nurturing, trust, security and stability." The doctor concluded that another transition for S.M. would increase the probability of "irreparable and enduring harm" to her.
D.M. again engaged the services of Dr. Susan Herschman. Dr. Herschman conducted a bonding evaluation between S.M. and her foster mother on March 16, 2009, a psychological evaluation of D.M. on April 16, 2009, and a bonding evaluation between D.M. and S.M. on April 20, 2009. As to D.M., the doctor noted that D.M.'s *1016 "health has improved and she has become increasingly more independent and responsible for her own health and physical, care." Elaborating on D.M.'s independence, the doctor stated that "[w]hile, in the past, she was dependent on [F.M.], she now realizes that she cannot let his issues interfere with the reunification of [S.M.]. [D.M.] has proven that she is able to reside on her own, cook, shop, and organize transportation to get her to different appointments." Concerning her illness, the doctor noted that "[w]hile [D.M.] remains on disability, her MS is currently in remission. [D.M.] still experiences some pain, and takes medication, but when observed in evaluations, the medication did not appear to hamper or interfere with her level of alertness."
The doctor described the bond between S.M. and her foster parents as "strong" and "comfortable." She explained that S.M. feels like part of the foster family, and that the foster family was caring and loving, and that S.M. had a good relationship with her foster siblings. Dr. Herschman characterized S.M. as a resilient child who is easy-going and adapts well to her environment. Although she could not guarantee it, the doctor believed that S.M. would make a good adjustment if placed with her biological mother. The doctor stated that changing S.M.'s environment would be significant, but that "she would be able to adapt to that change without significant trauma or enduring harm." Finally, the doctor opined that termination of D.M.'s parental rights "would do more harm than good."
The Law Guardian presented Dr. Natalie Barone, a psychologist. On December 4, 2008, Dr. Barone conducted a bonding evaluation between S.M. and her foster family and a psychological evaluation of S.M. She did not conduct a bonding evaluation between S.M. and D.M., nor did she conduct a psychological evaluation of D.M.
Dr. Barone found that "[S.M.] has been consistently and lovingly cared for by her foster family over the last three years. As such, [S.M.] has developed an undeniably secure and healthy attachment with these caretakers and has emotionally thrived in their home." The doctor concluded that S.M. "considers her foster parents as her psychological parents" in that she has become "an integral part of [the foster] family" and community. The doctor stated that S.M. only has a biological tie to her natural mother and that their relationship is only conceptual. She opined that severing S.M.'s psychological attachment to her foster parents would result in S.M. suffering enduring harm while severing the relationship with her biological mother would not. In the doctor's opinion, if S.M. was separated from the foster family and her current community, she "would become withdrawn" and "depressed" and would "blame herself for the loss." The doctor acknowledged that S.M. is a resilient child, but that her resiliency could easily be broken by the loss of her foster family.
Drs. Jewelewicz-Nelson and Herschman also opined as to S.M.'s current relationship with her mother and the appropriateness of reunification. Dr. Jewelewicz-Nelson noted that D.M. "takes great care in her personal appearances" and "dresses in clothing more typical of much younger girls." She also noted that D.M. "walked with a cane" and "was bent over at almost a 90 angle due to her scoliosis" but was "sturdy on her feet."
Dr. Jewelewicz-Nelson reported that D.M. received average scores on all of the "psychometric measures," had an adequate understanding of child rearing issues, and showed adequate "coping strategies." However, according to the doctor, D.M.'s personality test indicated a "compulsive personality disorder." Although she described this is "a pervasive pattern or preoccupation *1017 with orderliness, perfectionism and control" the doctor stated that the characteristic "did not reach criteria for a diagnosis of a DSM-IV personality disorder." Finally, she noted that D.M. had the "intellectual understanding required for adequate child rearing practices."
However, Dr. Jewelewicz-Nelson opined that D.M. lacked understanding of the emotional attachment S.M. might have with her foster family. She also believed that D.M. would have difficulty recognizing S.M.'s emotional needs if reunited with her. As a result, the doctor opined that D.M. was not capable of parenting by herself.
Dr. Jewelewicz-Nelson also conducted a bonding evaluation of S.M. and D.M. The doctor observed S.M. and D.M. engage in conversation while playing cards, with S.M. telling D.M. about her foster family and various life activities. The doctor classified this as "age-appropriate activit[y]" and "content-appropriate conversations."
Dr. Herschman explained that D.M.'s psychological examination showed no depression or anxiety disorders, but revealed a "histrionic personality" characteristic, which the doctor explained was "not significant psychiatrically." The doctor described this finding as a "characteristic" consistent with "a narcissistic personality disorder" that displays itself in "the way she dresses, she's very energetic, [and] she... can be flamboyant at times." The doctor maintained that this characteristic was not dysfunctional, but rather was "part of who [D.M.] is."
Dr. Herschman also reported that during the psychological evaluation, D.M. appeared to be "a whole different person" from the last time she evaluated her during the first termination proceeding. Specifically, the doctor noted the physical difference in "how she carries herself, how she presents herself, how she relates, her alertness." Dr. Herschman testified that D.M. was open to counseling, but hesitant about the process. She also explained that D.M. "was doing everything on her own right now" including cooking and making doctor's appointments. The doctor testified that D.M. was self-sufficient and had been for the past several months.
Dr. Herschman characterized D.M. and S.M.'s relationship as "hesitant" and "uncomfortable" at first, but she attributed those observations to the lack of recent contact between D.M. and S.M. However, during the bonding evaluation, Dr. Herschman observed that S.M. was "extremely comfortable with her mother" and that S.M. "engaged in conversation throughout the evaluation with no period of silence."
Dr. Herschman admitted that D.M. has difficulty understanding some of S.M.'s feelings but that "she's beginning to." She recommended that D.M. attend individual therapy sessions and family counseling if S.M. was returned to her care. Dr. Herschman acknowledged that D.M. would need counseling regarding S.M.'s emotions toward and relationship with her foster family.
On June 23, 2009, the trial court entered an order supported by an oral decision terminating D.M.'s and F.M.'s parental rights to S.M. In so doing, the trial court rendered findings of fact as to the appropriateness of reunification and any psychological or emotional harm S.M. might suffer from the breaking of her bond with her foster parents. As to the appropriateness of reunification, the court stated:
... [D.M.] has been a motivated and consistent presence in the case since the remand.
....
... And I have to say that over the course of my exposure to [D.M.], I tend to like and approve of her. Obviously, nobody's perfect and there have been issues, but in just getting a sense of her *1018 as she comes into the case and conducts her life business under sometimes difficult circumstances, I have no problem with that proposition [(reunification)], in general.
As to the opinion of Dr. Jewelewicz-Nelson, the court stated:
I have to say that I cannot help but disagree to some extent with Dr. [Jewelewicz-Nelson]. In light of the case history, I don't know anyone who would not be angry and should not be angry and direct their anger, certainly, at the Division. We work in a very difficult case type and now that the Appellate Division has said there was a mistake made ... I cannot assign much weight to the pure fact that [D.M.] may be angry.
I do think that her thinking, her feeling, does play into her capacity to mitigate harm to [S.M.] upon reunification, but as I just said, I ... have trouble attaching negative consequences to feeling anger.
Concerning the testimony of Dr. Herschman, the court noted:
Dr. Herschman's cumulative view was that [D.M.], with appropriate counseling for both herself and [S.M.], could help [S.M.] adjust to the loss of her foster family and transition to a reunified life.
So what I distill from Dr.... Herschman also refers to the anger that [D.M.] has felt. I think on balance, my own thought is that in terms of where she is at, meaning [D.M.], in terms of her psychological functioning at this juncture, is that it is not as problematic, in my view, as Dr. [Jewelewicz-Nelson] characterizes it, and I have to say that I understand why she would be angry.
At the same time, I think that in reading and understanding Dr. Herschman's report and testimony, there are elements of her personality that, perhaps, she needs help with while she is helping or would be helping [S.M.] adjust to a reunification. So those are considerations in determining whether there should or ... can appropriately be a reunification.
In determining that S.M. would suffer serious psychological harm if the bond between her and her foster parents is broken, the court reasoned:
These are my conclusions and concerns. [S.M.] has been in foster placement since August of 2005. It is now June of 2009. We all know how that came about in terms of the procedural history. One thing we definitely don't have is a time machine and so we can't change that fact.
The years that she has been in that placement have been her years from the age of, let's see, just before she turned four, to this time when she is nearly eight.
One thing that occurs to me is that in removing [S.M.] from the foster parents and attempting a reunification with one or both of the biological parents, we are now in a situation where we have a child who not only is in a foster placement with foster parents, and all experts agree that that is a strong bond, she has also had the experience of forming attachments, and now I'm using it in a, perhaps, a laymen's sense, with a whole host of members of a more extended community.
....
I think that the experts testified, in particular I think it was Dr. Barone, talked about what attachment and bonding means at different developmental stages. This particular young child is at a stage where, I think it's fair to say, these extended community connections take on significant meaning.
... Dr. Barone said that the foster parents, quoteon Page 10 of her report, "They have built a loving community *1019 for [S.M.] that includes siblings, extended family and friends, classmates and teachers. As a result, [S.M.'s] attachment to her foster parents created various levels of bonding to many other people. By the same token, the severing of [S.M.'s] attachment to her foster parents would be correlated with the loss of [S.M.]'s entire small but significant community.
[ ]This examiner opines that removing [S.M.] from her foster family would result in severe and enduring emotional harm and would not be in her best interest."
That articulation of the risk makes sense to me. Again, not only a loss of psychological parents, perhaps, but all of these other connections, which I would say constitutes a seven, nearly eight-year-old child's extended universe, that is a significant consideration.
Dr. [Jewelewicz-Nelson] ... talked about, "the psychological and emotional risk[s] to [S.M.] should she not be adopted by this family are significant. She is likely to feel guilty ... that it is her fault that she was not adopted. She is also likely to experience intense grief and bereavement at losing this family to whom she has become quite attached during a formative part of her development."
I think that [echoes], what I'll call, the amplified concern about not only breaking a bond with foster parents, but with foster family and what I'll call foster community.
Dr. Herschman, as I mentioned before, took a different view and said that in her view, that a reunification is not likely to cause [S.M.] enduring emotional distress.... She says, of course, not likely and these are not things that can be established with certainty.
....
So what I think we are left with is the reality that because of the case history, the bonding that has occurred, although if we had the ability to go back in time would not occur, we have a situation where, in my view ... there is clear and convincing evidence and clear and convincing commonsense evidence, that breaking the current bond, which has been identified as a strong bond with the foster parents, would, to a ... reasonable degree of psychological certainty, cause serious and lasting harm to [S.M.].
And so, I'm left with the dilemma of either doing the thing that I think would right a wrong in a sense, and that is reunify [S.M.] with [D.M.] and hope that Dr. Herschman is right that its not likely that the child would suffer severe and lasting harm. Or do what my sense tells me, my experience of these type[s] of cases, my thinking through this case, and not take that risk for [S.M.], the risk that she would suffer having ... been in this placement for an extended time, what the Appellate Division told me, specifically, to look for, serious and lasting harm.
And I concluded that [this] is what would be likely to happen and the kind of harm it would have.

III.
On appeal, D.M. argues:
POINT I.
THE APPELLATE DIVISION DECISION VIOLATED D.M.'S CONSTITUTIONAL RIGHTS AND, THEREFORE, S.M. AND D.M. SHOULD BE IMMEDIATELY REUNIFIED.
POINT II.
[DYFS] FAILED TO FOLLOW THE APPELLATE DIVISION DECISION GUIDELINES AND DID NOT COMPLY WITH THE CASE MANAGEMENT *1020 ORDERS DESIGNED TO ASSIST IN REUNIFICATION.
POINT III.
[THE TRIAL JUDGE] IMPROPERLY DENIED THE MOTION FOR A PSYCHOLOGICAL EVALUATION OF THE CURRENT CARETAKERS AS WELL AS THE MOTION TO BAR THE REPORT AND TESTIMONY OF NATALIE BARONE, [PH.D.].
POINT IV.
THE FACTS UPON WHICH [THE TRIAL JUDGE] BASED HIS DECISION ARE INACCURATE AND LED TO AN IMPROPER DECISION THAT MUST BE REVERSED.
POINT V.
THE APPELLATE DIVISION DETERMINED THAT THERE WAS NO BASIS FOR THE INITIAL REMOVAL AND NARROWLY DEFINED THE SUBJECT OF THE REMAND, AND, THEREFORE, ANY REFERENCE TO EVIDENCE FROM THE INITIAL TRIAL SHOULD HAVE BEEN EXCLUDED. (NOT RAISED BELOW).
Our review of the trial court's factfinding on an appeal from termination of parental rights is limited. M.M., supra, 189 N.J. at 278, 914 A.2d 1265. "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998). Such deference "is especially appropriate `when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412, 713 A.2d 390 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997)). Moreover, "`[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding.'" N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J.Super. 148, 172, 866 A.2d 1053 (App.Div.2005) (quoting Cesare, supra, 154 N.J. at 413, 713 A.2d 390). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); see also N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J.Super. 81, 89, 906 A.2d 463 (App.Div.2006), certif. denied, 190 N.J. 257, 919 A.2d 850 (2007).
In Point I of her brief, D.M. argues that the trial court erred in terminating her parental rights to her daughter without clear and convincing evidence that DYFS satisfied each of the four prongs of the best interests of the child standard. D.M. contends that evidence S.M. has bonded with her foster parents and has achieved stability and permanency in the foster parents' home to where the breaking of that bond might cause S.M. serious, psychological harm is insufficient to justify termination of parental rights. D.M. asserts that the trial court improperly circumvented a constitutional and statutory scheme for terminating her parental rights, and erroneously terminated her rights based solely on S.M.'s current bond to her foster parents.
DYFS counters that on remand "D.M. showed a continuing pattern of being unable to meet S.M.'s needs" and "that foster parent bonding alone may justify termination." The Law Guardian supports the Division's position on appeal.
Because the record is devoid of evidence that D.M.'s actions or omissions substantially contributed to her daughter's bonding with the foster parents, we reverse.
In our prior opinion, we found that DYFS had failed to prove prongs (1), (2) and (4) of the best interests of the child standard by clear and convincing evidence. Accordingly, we reversed. D.M. supra, *1021 (slip op. at 53). In so doing, we noted that the evidence of S.M.'s bonding with her foster parents was at best "mixed," and that S.M. had been in her foster care placement for three years. Id. at 50. Acknowledging that S.M. had no contact with her parents since June 2007, and that S.M. may have bonded with her foster parents since that time to where the breaking of that bond may cause serious psychological or emotional harm to S.M. requiring termination of parental rights, we remanded to address that issue through the lenses of J.C., and K.L.F.
Although not due to the fault of the trial court or any party, the remand proceeding neither proceeded nor concluded as expeditiously as anticipated. The trial court conducted an evidentiary hearing and determined that as of June 2009, almost four years since S.M. was placed with her foster parents, a strong bond had developed between S.M. and the foster parents, to where the breaking of that bond "would to a ... reasonable degree of psychological certainty, cause serious and lasting harm to [S.M.]." After reaching that conclusion, the court determined that it would be in the best interest of S.M. to terminate her parents' parental rights.
The trial court's finding that S.M. would suffer psychological harm if separated from her foster parents was based on credible evidence in the record. The court weighed the opinions of the three experts, and gave greater weight to the opinions of Drs. Barone and Jewelewicz-Nelson than that of Dr. Herschman. Because "the weight to be given to the evidence of experts is within the competence of the fact-finder," LaBracio Family Partnership v. 1239 Roosevelt Ave., Inc., 340 N.J.Super. 155, 165, 773 A.2d 1209 (App.Div.2001), we discern no reason to interfere with the court's finding. However, we disagree with the trial court's conclusion that this finding alone required termination of D.M.'s parental rights. In reaching this conclusion, we recognize that the language we employed in our previous decision may have inadvertently contributed to the problem we now address. That is, the trial court may have reasonably construed our previous decision as limiting the scope of the remand hearing to determining whether S.M. had bonded with her foster parents to such a degree that severing that bond would cause her "severe and lasting harm." This analysis, per force, excludes consideration of parental fault as part of the discussion. Unfortunately, an analysis that focuses entirely on the child's bonding with his or her foster parents, without a concomitant finding of parental fault, cannot stand.
Our courts have cautiously approached termination proceedings based upon the bond formed between a child and his or her foster parents. We first addressed this question in New Jersey Division of Youth & Family Services v. T.C., 251 N.J.Super. 419, 598 A.2d 899 (1991), certif. denied, 146 N.J. 564, 683 A.2d 1160 (1992).
In T.C., the trial court found the mother fit to parent her child; nevertheless, based upon the child's bond with his foster parents, the court terminated the mother's parental rights. Id. at 431, 598 A.2d 899. We recognized that while A.W. suggested "serious psychological damage to the child" could satisfy the first prong of the best interests of the child standard, "the cause of that disturbing effect [in A.W. of parental visits upon the removed child] was rooted in the prior parent-child relationship itself and was not simply due to the child's bonding to another after removal." Id. at 433, 598 A.2d 899. While we did not reject the overall theory of termination based upon foster parent bonding, we concluded "that termination without implication of substantial parental fault and based exclusively upon foster-parent *1022 bonding during temporary placement goes beyond the articulated standards of A.W." Id. at 432-433, 598 A.2d 899. See also In re Matter of A., 277 N.J.Super. 454, 470, 649 A.2d 1310 (App.Div.1994). Lastly, in reversing the trial court's decision in T.C. to terminate the mother's parental rights, we stated:
the constitutional, social and psychological force of these conjoined principles ordinarily weighs heavily against parental termination based on the foster-parent bonding of a child whose biological parents are fit to have her returned to them, particularly in those cases in which the parent-child separation has been substantially contributed to by public agencies whose mission it is to protect the family.
[T.C, supra, 251 N.J.Super. at 440, 598 A.2d 899.]
We also acknowledge that an isolated reading of J.C. might suggest that T.C. was implicitly overruled, thus, permitting termination of parental rights to rest solely on a showing that a child has bonded with his or her foster parents, to such a degree, that severing that bond would cause the child "serious psychological or emotional harm." Supra, 129 N.J. at 25, 608 A.2d 1312. However, on reading J.C. in the light of K.L.F. and G.L., we conclude otherwise. Indeed, T.C. was cited with approval by the Court in J.C, supra, 129 N.J. at 19, 608 A.2d 1312, and in K.L.F., supra, 129 N.J. at 45, 608 A.2d 1327.
In J.C., the Court addressed the issue of "whether the parental rights of a natural mother should be terminated based on the need to protect children from potential harm that may result from being separated from foster parents with whom the children may have formed parental bonds." Supra, 129 N.J. at 5, 608 A.2d 1312. In that case, a mother voluntarily placed her three children in foster care because of homelessness, domestic abuse, and her own substance abuse. Ibid. Three years later, DYFS filed a petition for guardianship on the grounds that the mother was "unable and unwilling to stop causing the children harm," and the delay in permanent placement would have added to the harm then facing the children. Id. at 6, 608 A.2d 1312.
Following a remand, the parties stipulated to certain facts concerning the mother's rehabilitation. They agreed that she had been living in the same apartment for two years, had been gainfully employed for two years, there was after-school childcare at her workplace, and she was drug and alcohol free. Id. at 15, 608 A.2d 1312. During the pendency of the action, the mother consented to the adoption of her youngest child by the foster parents. Id. at 7, 608 A.2d 1312. As to the two older children, the court terminated the mother's parental rights to them, finding that the children "would suffer serious psychological harm if they were removed from their foster or pre-adoptive homes and returned to [the mother], and that the harm in part was attributable to [the mother's] own inability to plan for their future and failure to rehabilitate herself." Ibid. We affirmed. Ibid.
In addressing the issue presented, the Court stated:
In cases in which DYFS seeks termination of parental rights, not on grounds of current unfitness but because of potential harm to the child based on separation from a foster parent with whom the child has bonded, the quality of the proof adduced must be consistent with the interests at stake. To the extent that the quality of the child's relationship with foster parents may be relevant to termination of the natural parents' status, that relationship must be viewed not in isolation but in a broader context *1023 that includes as well the quality of the child's relationship with his or her natural parents. As suggested by In re Guardianship of J.R., 174 N.J.Super. 211, [223, 416 A.2d 62 (App.Div.1980)], prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship, the severing of which would cause profound harma harm attributable to the natural parents and cognizable under the standards set forth in A.W., supra, 103 N.J. at 604-11, 512 A.2d 438.... To show that the child has a strong relationship with the foster parents or might be better off if left in their custody is not enough. [(Cite omitted).] DYFS must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm.
[Id. at 18-19, 608 A.2d 1312. (Emphasis added).]
The Court determined that the record did not support termination of the mother's parental rights. Id. at 25, 608 A.2d 1312. In so finding, the Court stated:
[T]hat does not mean, however, that termination may not be an appropriate resolution. DYFS has presented substantial evidence of the harm that may come to these children if separated from their foster parents. Hence, that evidence may not be disregarded, even though, as the record now stands, it does not meet the strict statutory and constitutional standards that govern the termination of parental rights.
Consequently, we remand to the trial court in order that additional evidence may be adduced directly addressing whether the two children have bonded with their foster parents and if so whether breaking such bonds would cause the children serious psychological or emotional harm.
[Ibid.]
In K.L.F., a case decided the same day as J.C., the Court also considered whether a parent's parental rights could be terminated based on psychological harm that a child might suffer after separation from his or her foster parents. Supra, 129 N.J. at 34, 608 A.2d 1327. In that case, a mother who was unable to find shelter for herself and her daughter, entered into a temporary custody agreement with DYFS and consented to the temporary placement of her daughter in foster care. Id. at 35, 608 A.2d 1327. After separation from her daughter for approximately eighteen months, DYFS placed the child with pre-adoptive foster parents. Ibid. The mother sought visitation with her daughter, but DYFS refused. Id. at 35-36, 608 A.2d 1327.
DYFS then instituted a guardianship proceeding seeking to terminate the mother's parental rights based on abandonment and on the best interests of the child standard. Id. at 36, 608 A.2d 1327. The court determined that the mother had not abandoned the children. Id. at 38, 608 A.2d 1327. The court also concluded that DYFS had failed to prove the best interests of the child standard, determining that there was sufficient evidence to support a finding that the mother was a fit parent with "the ability and capacity not only to care for [her daughter] but to minimize the trauma involved in separating [her daughter] from her foster parents." Id. at 43, 608 A.2d 1327. We affirmed, ibid., and so did the Supreme Court. Id. at 46, 608 A.2d 1327.
Like in J.C., the Court held that "injury to children need not be physical to give rise to State termination of biological parent-child relationships. Serious and lasting emotional or psychological harm to *1024 children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize termination of parental rights." Id. at 44, 608 A.2d 1327 (emphasis added). In discussing the best interests of the child standard and noting that the mother had undertaken "substantial steps to prepare a stable and secure home environment for her daughter," id. at 44, 608 A.2d 1327, the Court stated that "[t]he standard is not that the end result cause no pain or trauma but that the child be kept from its parents only to avoid serious and lasting harm." Id. at 45, 608 A.2d 1327. As to the bonding, the Court concluded that much of the bonding between the foster parents and child had taken place because of the mistaken actions of DYFS, not the mother. Ibid.
In G.L., the Court addressed the question, "[w]hen may a parent be subjected to the termination of [his or her] parental rights for failing to eliminate harm to the child posed by [his or her] spouse?" Supra, 191 N.J. at 599, 926 A.2d 320. In answering the question, the court reinforced the principle that termination of parental rights based on the best interests of the child standard "is conduct-based," id. at 608, 926 A.2d 320, not based on "[p]resumptions of parental unfitness," directing that all doubts of parental unfitness must be resolved against termination. Id. at 606, 926 A.2d 320.
G.L. involved the termination of a mother's parental rights to her newborn daughter. Prior to the daughter's birth, the mother's infant son had died under suspicious circumstances while in the care of the child's father. Id. at 599, 926 A.2d 320. The father was subsequently indicted for second-degree manslaughter and third-degree endangering the welfare of the child. Id. at 600, 926 A.2d 320. While the case was pending, the mother gave birth to her daughter.
Although the mother and father were living apart at the time of the daughter's birth, DYFS required as a condition of the mother retaining custody of her daughter to restrict the father from unsupervised visitation with the child. The mother complied. Id. at 600-01, 926 A.2d 320. Nonetheless, because the mother continued to believe that the father had not caused the injury leading to the death of her son, but had only failed to timely call for help, DYFS filed a complaint seeking custody and care of the daughter, alleging that the mother might allow the father access to the child. Id. at 601, 926 A.2d 320.
The Division's psychologist recommended reunification of the mother and daughter; however, the trial court disagreed and directed the Division to proceed with termination of parental rights. Id. at 602-03, 926 A.2d 320. Following trial, the court ordered termination of the mother's parental rights reasoning that the mother's unwillingness to sever ties with the father posed a serious risk to her daughter. We affirmed. Id. at 604, 926 A.2d 320.
The Court reversed, reaffirming that in a termination proceeding based on the best interests of the child standard "DYFS bears the burden of proving each of those prongs by clear and convincing evidence." Id. at 606, 926 A.2d 320. (Emphasis added). The Court held that the trial court's finding that the child was threatened by the mother's actions was "based on speculation and not on clear and convincing evidence. The judge simply presumed that [the mother] could not keep [the child] safe." Id. at 608, 926 A.2d 320. As to the fourth prong, the Court stated:
One final note: The trial judge considered the lack of a strong bond between [mother and child] as supporting termination. To be sure, the bond was thin as the direct result of the improvident *1025 removal of [the child] from her mother's custody in 2003. Because she has lived with others for most of her life, [the child] has naturally become attached to them and her bond with her mother was weakened. That conclusion merely satisfies the fourth prong of the statute that termination would not do more harm than good. That prong serves as a fail-safe against termination even where the remaining standards have been met. It does not provide an independent basis for termination where the other standards have not been satisfied. [The child] should never have been removed from [the mother's] custody. It follows that [the mother's] parental rights should not have been terminated. [Id. at 608-09, 926 A.2d 320 (emphasis added).]
Our reading of J.C., K.L.F. and G.L. leads us to conclude that where DYFS fails to prove all prongs of the best interests of the child standard, any psychological or emotional harm a child may suffer as a result of the breaking of the bond between the child and his or her foster parents cannot, in and of itself, serve as a legally sufficient basis for a termination of a parent's parental rights. In such a case, DYFS must still prove by clear and convincing evidence that the parent's actions or inactions substantially contributed to the forming of that bond, and that the harm caused to the child from severing that bond rests at the feet of the parent. Such proof would follow the Court's direction that termination of parental rights is "conduct-based," G.L., supra, 191 N.J. at 608, 926 A.2d 320, by requiring a showing that "[t]he parent is unwilling or unable to eliminate the harm facing the child.... Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2).
We found in our prior opinion that until the trial court entered the May 22, 2007 order terminating D.M.'s and F.M.'s parental rights, S.M. had maintained a loving relationship with her parents, and that at best, proof S.M. had bonded with her foster parents was "mixed." D.M., supra, slip op. at 50. We remanded to determine whether S.M. had bonded with her foster parents since May 22, 2007, and whether severing that bond would cause S.M. to suffer serious psychological or emotional harm. Id. at 52. With the trial court so determining, the question becomes whether the record contains evidence showing that D.M. substantially contributed to the forming of that bond between her daughter and the foster parents. We answer the question in the negative.
DYFS did not substantiate abuse, neglect, or abandonment against D.M. To the contrary, as noted by the trial court, the original termination had been reversed "because there was no evidence linking [D.M.'s] various issues and problems to harm to [S.M.] or even a realistic risk of harm to [S.M.]." Nor on remand did the trial court find any fault on the part of D.M. concerning her actions or omissions in not maintaining contact with her daughter while the appeal was pending, leading to a stronger bond between the child and her foster parents than between S.M. and D.M.
The trial court expressed concern over the absence of F.M., the potential for future episodes of domestic violence if F.M. returns to the family home, D.M.'s potential (but justified in the court's view) anger with the Division, and some of D.M.'s shortcomings in addressing S.M.'s emotional needs. However, none of these concerns amount to a finding of fault on D.M.'s part leading to the strengthening of the bond between S.M. and her foster parents.
*1026 Indeed, D.M.'s actions speak to the contrary. Following remand, D.M. tried to maintain a relationship with her daughter when given the opportunity. D.M. petitioned and was granted visitation with her daughter. Between February 24, 2009 and April 21, 2009, D.M. attended seven visitation sessions on a weekly basis with S.M. She also petitioned and was granted visitation during the pendency of this appeal. Accordingly, the trial court did not, and we cannot, find that D.M. substantially contributed to the bonding between S.M. and the foster parents.
The Court's recent decision in C.M., supra, supports our conclusion that termination of parental rights cannot be justified by evidence that a child may suffer serious, psychological or emotional harm by severing the bond between the child and his or her foster parents without evidence that the parent substantially caused, directly or indirectly, the harm to the child. The Court reaffirmed the principle that to terminate a parent's parental rights, DYFS bears the burden of proving by clear and convincing evidence each of the four statutory prongs of the best interests of the child standard. C.M., supra, ___ N.J. at ___, ___ A.2d ___ (slip op. at 30). That S.M. would have bonded with her foster parents between the conclusion of the first termination proceeding and the remand proceeding should not have come as a surprise, D.M. having been improperly separated from S.M. while the first appeal was pending. As noted by the Court "[i]t is well-established that the period of time a child has spent in foster care is not determinative of whether parental rights to that child should be terminated, as `[t]he protection of parental rights continues when a child is placed in foster care.'" C.M., supra, ___ N.J. at ___, ___ A.2d ___ (slip op. at 33) (quoting K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246). Indeed, "[i]n respect of the first prong of the test for terminating parental rights, ... [the] Court has made clear that `[t]he statute requires that the State demonstrate harm to the child by the parent' and that the `[h]arm, in this context, involves the endangerment of the child's health and development resulting from the parental relationship.'" Ibid. (quoting K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246). Here, as previously stated, we found the record devoid of any evidence, much less clear and convincing evidence, that D.M. substantially contributed to the forming of the bond between S.M. and her foster parents.
We reverse that part of the June 23, 2009 order that terminated D.M.'s parental rights to S.M. We remand to formulate a plan for reunification between D.M. and S.M. that will be in S.M.'s best interests. The plan should include therapy for D.M. and S.M., individually and jointly, and increased supervised visitation between the parent and child, leading to unsupervised daytime supervision and subsequent overnight visitation as determined by the court to minimize any emotional harm to S.M. caused by separating her from her foster family. The plan should also include an evaluation of D.M.'s present ability to care for her daughter.
We direct that the court formulate its initial plan of reunification within thirty days of the date of this decision. Because of the necessity to bring this matter to a fair and just conclusion in the best interests of S.M., we retain jurisdiction to address any issues that may occur on remand until S.M. has been fully reunited with her mother.
Reversed and remanded for further proceedings consistent with this opinion.
SKILLMAN, P.J.A.D., concurring.
In In re Guardianship of J.C., 129 N.J. 1, 25, 608 A.2d 1312 (1992), the Court "conclude[d] that there is not clear and *1027 convincing evidence to support the determination to terminate [the natural parent's] parental rights" under the applicable statutory standards. Nevertheless, the Court held that termination of parental rights still might be "an appropriate resolution" of DYFS's guardianship action. Ibid. In explaining this conclusion, the Court stated:
... DYFS has presented substantial evidence of the harm that may come to these children if separated from their foster parents. Hence, that evidence may not be disregarded, even though, as the record now stands, it does not meet the strict statutory and constitutional standards that govern the termination of parental rights.
Consequently, we remand to the trial court in order that additional evidence may be adduced directly addressing whether the two children have bonded with their foster parents and if so whether breaking such bonds would cause the children serious psychological or emotional harm.
[Ibid.]
The Court also noted that:
... In hearing a petition for termination in which the fitness of natural parents is neither relied on nor disputed by the agency, the trial court must also consider parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child.
[Id. at 19, 608 A.2d 1312.]
On the first appeal in this case, we concluded that "there is not clear and convincing evidence to support [the trial court's] decision to terminate [D.M.'s] parental rights" under the standards set forth in N.J.S.A. 30:4C-15.1(a). N.J. Div. of Youth & Family Servs. v. D.M., No. A-6125-06T4 (Aug. 11, 2008) (slip op. at 51). Nevertheless, relying upon J.C., we held that the termination of D.M.'s parental rights still might be required in S.M.'s best interests. Accordingly, we remanded to the trial court "in order that additional evidence may be adduced directly addressing whether [S.M. has] bonded with [her] foster parents and if so whether breaking such bonds would cause [S.M.] serious psychological or emotional harm." Id. at 52. (quoting J.C., supra, 129 N.J. at 25, 608 A.2d 1312).
The trial court conducted the evidentiary hearing we ordered and found "to a moral certainty" that denying termination of parental rights and compelling reunification of S.M. with D.M. would create "a grave and substantial risk of lasting and enduring harm to [S.M.]." As the majority concludes, there is substantial credible evidence in the record to support this factual finding. See ante, 414 N.J.Super. at 74, 997 A.2d at 1021.
Under J.C. and the express terms of our remand, I would conclude that the order terminating D.M.'s parental rights to S.M. should be affirmed. However, I am now constrained to conclude, in light of the Court's subsequent decisions discussed in Judge Gilroy's opinion, particularly New Jersey Division of Youth & Family Services v. C.M., ___ N.J. ___, ___ A.2d ___ (2010), which was decided just last week, that the part of J.C. that we relied upon in remanding this case is no longer good law and that the order terminating D.M.'s parental rights must be reversed.
C.M. unequivocally states that parental rights may be terminated in a guardianship action brought under N.J.S.A. 30:4C-15(c) only if DYFS establishes each of the four standards set forth in N.J.S.A. 30:4C-15.1(a):
... [T]hose four standards or "prongs," measured against a clear and convincing evidence standard of proof, are what must govern our inquiry. In *1028 determining whether a parent's parental rights to a child are to be terminated, it is those four standards and their applicationand only those four standards that command our focus.
[Id. at ___, ___ A.2d at ___ (slip op. at 31) (emphasis added).]
A review of the remainder of the Court's opinion leaves no doubt that a court may not terminate parental rights unless each of the four standards set forth in N.J.S.A. 30:4C-15.1(a) is satisfied, even if, as in this case, the record indicates that denying termination of parental rights and compelling reunification of a child with his or her natural parent "would cause the [child] serious psychological or emotional harm." J.C., supra, 129 N.J. at 25, 608 A.2d 1312. Therefore, I concur in the reversal of the order terminating D.M.'s parental rights.
NOTES
[1] TSVP is an acronym for the Therapeutic Supervised Visitation Program.
[2] F.M. did not comply with the court's orders, did not visit S.M., and only appeared at one hearing on remand. The trial court denied the Division's and the Law Guardian's motion to enter default against F.M., as F.M. was represented by counsel.