# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5560-17T2
                 A-5561-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

P.A.A. and K.T.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.A.T.,
JH.A.T., J.C.T., and JO.C.T.,

      Minors.

_____

      Argued on August 13, 2019 – Decided August 26, 2019

      Before Judges Sumners and Moynihan.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0025-18.

Stephania Saienni-Albert, Designated Counsel, argued the cause for appellant P.A.A. (Joseph E. Krakora, Public Defender, attorney; Stephania Saienni-Albert, on the briefs).

Andrew Robert Burroughs, Designated Counsel, argued the cause for appellant K.T. (Joseph E. Krakora, Public Defender, attorney; Andrew Robert Burroughs, on the briefs).

Nancy Rose Andre, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Nancy Rose Andre, on the brief).

David Ben Valentin, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

P.A.A. (Patricia)[1] and K.T. (Kevin) appeal from an order terminating their parental rights to their two daughters J.A.T. (Janet), born January 20, 2012, and JH.A.T. (Jhana), born April 17, 2014, and twin sons J.C.T. (James) and JO.C.T. (Joshua), born December 13, 2015. Following a five-day trial on June 29, 2018, the judge rendered a fifty-five page oral opinion, and her order was entered on

---

[1] We use pseudonyms for the children and parents to protect their privacy and for ease of reference.

July 17. For the reasons that follow, we reject the parents' contentions that the Division of Child Protection and Permanency (Division) failed to meet its statutory burden under each prong of the best interests test, codified at N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence.

I.

In reviewing a decision by a trial court to terminate parental rights, we give "deference to family court[s'] fact[-]finding" because of "the family courts' special jurisdiction and expertise in family matters[.]" Cesare v. Cesare, 154 N.J. 394, 413 (1998). The judge's findings of fact are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Here, the judge carefully reviewed the evidence presented, and thereafter concluded that the Division had met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. Her oral opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with In re

3

Guardianship of K.H.O., 161 N.J. 337 (1999), In re Guardianship of DMH, 161 N.J. 365 (1999), and New Jersey Division of Youth & Family Services v. F.M., 211 N.J. 420 (2012), and is supported by substantial and credible evidence in the record. We therefore affirm substantially for the reasons the judge expressed in her comprehensive and well-reasoned opinion. We add the following remarks as to each prong.

A. Prongs One and Two

As to prong one, the Division must prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 289 (2007).

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)). As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent

may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 605 (1986)).

"The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." DMH, 161 N.J. at 379. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

As to prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). That harm may include evidence that separating the children from their resource parents "would cause serious and enduring emotional or psychological harm . . . ." Ibid.

The Division can establish the second prong by proving that a "child will suffer substantially from a lack of stability and a permanent placement[,] and from the disruption of" a bond with the resource parents. K.H.O., 161 N.J. at

363. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." DMH, 161 N.J. at 379.

1. Patricia

Janet and Jhana were removed in 2014 from Patricia's care when she allowed them to be left unsupervised with her then-boyfriend, who left the girls alone, and Jhana fell off a bed and sustained a burn on her cheek from a hot radiator. Contrary to Patricia's argument that she took full responsibility for the incident because she accepted the Division's finding of neglect, the record shows she gave inconsistent accounts of how the injury occurred and did not take Jhana to the hospital until two days later after realizing the injury could be infected. The boys were yet to be born.

Similarly, in 2016, only seven months after being reunified with the girls, Patricia was involved in a car accident while driving with a suspended license with all four children as passengers; two of whom were not properly restrained. She failed to cooperate with the police and refused medical treatment for the children; despite Jhana stating she hurt her knee. Her children were removed from her care. The girls were placed with one resource home, with the boys being placed in another resource home.

A-5560-17T2

Thereafter, Patricia was using PCP and did not visit her children for a five-month period, correlating directly with her drug use, admitted she spent her money entirely on drugs, and told workers she "just gave up." Further, on a few occasions Janet has acted out, and is currently undergoing counseling to deal with her emotions. She expressed concerns about returning to her mother's care, and wanted to remain with her resource parents.

In 2015, Dr. Ronald S. Gruen, Ed.D., conducted a psychological evaluation and determined that she was "immature, self-absorbed, and emotionally detached." In 2016, Dr. Mariann Pokalo, Ph.D., conducted a psychiatric evaluation; reporting concerns regarding Patricia's reunification with her children based upon her lack of judgment due to substance abuse and the need to avoid relations with men that resulted in domestic violence against her. Based upon his psychological evaluation in 2018, Dr. James R. Loving Psy.D., testified that although she was seemingly focused on reunification, she risked "subjecting her children to neglectful care; being unable to maintain a safe, stable household; domestic violence; substance abuse; and failure to protect her children from other people's harmful behavior."

The judge determined that Patricia's conduct in the 2014 and 2016 incidents constituted a pattern of inappropriate behavior, consisting of the same

7

poor judgment and irresponsible conduct that was identified in her psychiatric and psychological evaluations. The judge found that the evaluations and related testimony were credible, while finding Patricia was not credible.

Patricia now contends that Dr. Loving's opinion and the court's agreement that none of the children would experience any serious harm if her parental rights were terminated was improper, and based on mere speculation. She maintains that Dr. Loving failed to take into consideration the many positive and affectionate visits she had with the children, where she was attentive to their needs. She argues the only concern the Division had was her employment and housing situation. She further contends the judge's finding that disruption of a bond with the resource parents is an insufficient basis for termination of parental rights in situations where the Division failed to show her "actions or inactions substantially contributed to the forming" of the resource parent-child bond. See N.J. Div. of Youth & Family Servs v. D.M., 414 N.J. Super. 56. 59 (App. Div. 2010).

Based on the judge's credibility findings, the opinions of the three professionals and the facts surrounding the two incidents that prompted the children's removal from Patricia, there is clear and convincing evidence to support the judge's finding that a continued parental relationship with Patricia

8

would harm the children based on her history of being unable to provide a safe home that properly nurtures and cares for them. It is evident that Patricia has failed to provide for the safety and welfare of her four children for an extended period of time.

2. <u>Kevin</u>

Kevin's situation is much different from Patricia's because of his two lengthy periods of incarceration but the result is the same – he has been unable to parent his children.

The judge recognized that prior to being incarcerated in February 2012, Kevin was present for Janet's upbringing, but she was so young that she never developed a strong connection with him. As to Jhana, Kevin was incarcerated for most of her life and had minimal contact with her following her reunification with Patricia after the first removal. However, he was incarcerated again in August 2015. The two boys never met Kevin until the bonding evaluations, as he was incarcerated since their birth.

Kevin's lack of a relationship with his children was evident during the bonding evaluation conducted by Dr. Loving. Janet was notably fearful and anxious, despite eventually warming up to him. Jhana, however, was indifferent

A-5560-17T2

to Kevin's presence, mostly opting to play alone or find her brothers. In addition, he had no connection with his sons.

Although a parent's incarceration is not a per se justification for termination of parental rights, it is "unquestionably relevant" to the decision. Matter of Adoption of L.A.S., 134 N.J. 127, 136-37 (1993). Incarceration is probative of abandonment but does not justify termination as a matter of law. Id. at 137. "[I]ncarceration alone—without particularized evidence of how a parent's incarceration affects each prong of the [best interests of the child] standard—is an insufficient basis for terminating parental rights." N.J. Div. of Youth & Family Services v. R.G., 217 N.J. 527, 556 (2014). Thus, when determining whether incarceration constitutes abandonment, courts should consider the "nature of the contact between parent and child before and after incarceration, the efforts made by the parent to maintain contact with the child following imprisonment, and the attempts during incarceration to undertake as much responsibility for the child's welfare as possible." L.A.S., 134 N.J. at 138.

The judge determined that under prong one, Kevin's incarceration over four years is a "form of neglect that the children have suffered [from] and they were being endangered by [their] relationship with him because he wasn't there[.]" Simply put, he was unable to care for the children.

Kevin contends the judge improperly relied on his drug use and incarceration in her decision. He argues that the Division failed to provide any evidence that his illicit marijuana use harmed or affected his children or ability to parent, and claims there was no evidence that he engaged in criminal activity when his kids were present. He relies upon N.J. Div. of Child Prot. & Perm. v. R.W., 438 N.J. Super. 462, 471 (App. Div. 2014), where this court held that the parent's consumption of illegal drugs or committing a crime, alone, is insufficient to sustain an abuse and neglect charge. Further, Kevin maintains that a parent's "lengthy incarceration" is only one factor in determining whether a parent is unfit or abandoned the child. See L.A.S., 134 N.J. at 143. He asserts his scheduled release in 2018 made him available for his children.

In this case, Kevin's incarceration is certainly probative of his inability to prevent further harm to his children, and is also probative of his unwillingness to care for them. The judge never mentioned his drug use as a reason for finding that his conduct harmed his children. She merely cited it as the reason why he was incarcerated. His history of incarceration does not support his contention that he will be able to eliminate the harm facing his children and would be able to provide a safe and stable home. Shortly after his release from prison in early 2018, Kevin violated parole again.

Moreover, despite Kevin's theorized plan of living with his sister and obtaining employment with his cousin's trucking company, he had no definitive plans that were indicative of his ability to create a stable household. He further admitted that he would be unable to care for the children for at least six months after release. Although Kevin engaged in certain programs offered in prison, they were intended to assist inmates with re-entry into society, not parenting skills classes. Under these circumstances, it is speculative at best to expect Kevin to get himself together such that he would be able to properly parent his four children and remedy the harm facing them in the long term.

B. Prong Three

As to prong three, the Division is required to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,] and the court [will] consider[] alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). This prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354.

The Division must prove that it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home."  N.J.S.A. 30:4C-15.1(a)(3).  "Reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the [reasonable] efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court[.]"  DMH, 161 N.J. at 390.

The Division

> must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family.  [It] must promote and assist in visitation and keep the parent informed of the child's progress in foster care.  [It] should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that

relationship and, eventually, to become an effective caretaker and regain custody of his or her children.

[Id. at 390 (citing N.J.S.A. 30:4C-15.1(c)).]

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

N.J.S.A. 30:4C-12.1(a) requires the Division to initiate a search for relatives who may be willing and able to provide the care and support required by the child within thirty days of accepting a child into its care or custody. The Division must assess each interested relative and, if it determines that the relative is unable or unwilling to care for the child, inform them of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a)-(b).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Family Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "The Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division[.]" K.L.W., 419 N.J. Super. at 582. It cannot

ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

1. Patricia

The Division offered a multitude of services to Patricia to address her individualized needs to obtain reunification. They included: individualized counseling; bus passes; supervised visitation, domestic violence support and housing; substance abuse counseling, and parenting classes. However, Patricia did not consistently keep in touch with the Division, did not regularly visit her children, and failed to partake in services.

As for considering alternatives to termination of their parental rights, Patricia and Kevin wanted his sister, Catherine, to obtain custody of all four children under a Kinship Legal Guardianship (KLG). Yet, at one time, Patricia indicated to the Division that she did not want Catherine to have custody of the children, because she was concerned they would be kept from her.

Both the Division and the court rejected Catherine, on numerous occasions, for KLG. In 2015, after the children were initially removed from

Patricia and placed with Catherine, the Division removed them from her care because she did not cooperate with an investigation by the Institutional Abuse Investigation Unit, and instead closed her licensed resource home. Also, contrary to the Division's placement conditions, Catherine allowed Patricia and Kevin to have unsupervised visits.

In 2016, a different judge denied her application for custody, explaining she was incapable of caring for all four children and indicating her house was too small for all of the children. She reapplied in March 2018, but because the children were already bonding with their resource parents, the Division did not consider her request. Moreover, Catherine admitted during her May 2 custody hearing that she could not take all four children until February – four months before the parental rights termination trial – because she did not have a full-time job or adequate living space. Although she had acquired a full-time job at the time of trial, she essentially admitted that her housing was inadequate to house all four children.

The judge found the proofs were clear and convincing that Patricia's persistent problems, including her abuse of PCP,[2] impeding reunification with

_____

[2] Phencyclidine.

her children were due to her inability to comply with and regularly participate in the services offered, and not the Division's failure to provide them. Further, a KLG for Catherine was not a reasonable option given her lack of cooperation, her limited capability to care for four young children, and the need to provide sustained stability for them.

Patricia contends the Division failed to exercise reasonable efforts to provide her with services compatible with her work schedule to promote reunification, and it did not take into consideration her history with it as a minor, and when she gave birth to J.A.B.[3] She contends the judge's conclusion that the Division considered alternatives to parental termination and that she did not want the children with Catherine is factually and legally erroneous. We disagree.

Substantial credible evidence exists to support the judge's findings that the Division made reasonable efforts to provide services to help Patricia correct the circumstances that led to the placement of her children outside the home. The judge considered alternatives to termination of parental rights, such as KLG

---

[3] J.A.B. is Patricia's eldest child from a different relationship and is not a subject in this appeal.

with Catherine, and its rejection of that option was based upon credible evidence in the record.

2. <u>Kevin</u>

Kevin's pattern of incarceration hindered the Division's ability to provide services that would enable him to parent his children. He was incarcerated during the second removal of the children from Patricia, and when possible, the Division attempted to provide him with services; including batterer's intervention, parenting skills classes, and substance abuse programs. It also made efforts to schedule visitation with the children, however Kevin only had one visit with them before he was re-incarcerated in August 2015. Accordingly, the judge found there was no basis for finding that the Division neglected its responsibility to offer services to Kevin.

Kevin argues that the judge did not make findings regarding his contention that Catherine should have been appointed KLG over the children. In doing so, he largely reiterates the arguments made by Patricia regarding the Division's failure to consider Catherine as a viable option for placement. Kevin adds that the judge should have considered gradual reunification with him while the children resided with Catherine. He contends there should be a remand to require the judge to make KLG findings as to him.

Furthermore, Kevin argues the Division made reasonable efforts to provide services to him that would help remedy the issues that led to his loss of custody. He refers to his completion of various rehabilitation programs while in prison as evidence of his effort, and states the Division made little to no attempt to provide him with services.

Similar to Patricia, Kevin fails to persuade us that the Division neglected its duty to provide services to him. Due to his incarceration, he was not in a position to benefit from services to help obtain custody of his children.

We agree that the judge failed to make specific findings as to Kevin's argument that Catherine should be appointed KLG. Nevertheless, it is patently clear that the findings made with respect to Patricia apply to Kevin as well. As noted above, there was no reasonable alternative to termination of parental rights, such as KLG to Catherine. As for gradual reunification with him while the children resided with Catherine, that was not a reasonable option given his lack of stability, Catherine's history with the children, and her lack of stability. The children needed the comfort and stability that was being provided by the resource parents.

C. Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The prong focuses on the important consideration of a child's need for permanency. M.M., 189 N.J. at 281. "The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355. In order to weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on the strength of each relationship. J.C., 129 N.J. at 25. "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

The bonding evaluation between the respective resource parents and the children took place on two separate dates. Dr. Loving found that Janet and Jhana would refer to their resource parents as "mommy" and "daddy," had no trouble interacting with them, felt comfortable discussing life events with them, and

wanted to share new activities with them. He noted that the resource parents were attentive, skillful, and showed a unique interest in the girls' conversations. He opined that the girls showed strong attachments to the resource parents, as well as familiarity, closeness, and enjoyment. Dr. Loving found that James and Joshua's bonding evaluation was similar. He added that the twins formed "strong and centrally[] important attachments" with their resource parents. He opined that all the children would suffer severe and enduring harm if they were removed from their current resource homes.

1. Patricia

Dr. Loving's bonding evaluation revealed that although Janet did show signs of attachment to Patricia and terminating parental rights may do some harm, it would be mitigated by the resource parents. He believed Jhana had a positive bond with her mother, but it was a very weak attachment. With respect to the twin boys, Dr. Loving determined they had very weak attachments to Patricia, but a strong attachment to the resource parents.

Relying upon Dr. Loving's expert opinion, the judge found that termination of Patricia's parental rights was justified because all four children have strong bonds with their resource parents, she could not care for all four children, and the children's ages heighten the need for permanency. See N.J.

Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593-94 (holding that the fourth prong was satisfied based on child's bond with resource parents, the child's need for permanency, and the biological mother's inability to care for him in the foreseeable future).

Patricia argues that Dr. Loving's opinion, which the judge agreed with, that none of the children would experience any serious harm if her parental rights were terminated was improper, and based on mere speculation. She acknowledges that Janet expressed to the caseworker and resource parents that she did not want to return to her care, however she maintains Dr. Loving failed to take into consideration the many positive, affectionate, and attentive visits she had with the children. She posits the only concern the Division had was her employment and housing situation. Further, she contends the court's finding that disruption of a bond with the resource parents is an insufficient basis for termination of parental rights in situations where the Division failed to show her "actions or inactions substantially contributed to the forming" of the resource parent-child bond. See N.J. Div. of Youth & Family Servs v. D.M., 414 N.J. Super. 56, 59 (App. Div. 2010). We are unpersuaded.

Although Patricia made some strides toward completing services in January 2018, the children by that time had been in the custody of their resource

parents for two years. Moreover, Dr. Pokalo's 2016 psychiatric evaluation recommending that Patricia's parenting abilities would improve if more therapy was provided, reflected the same concerns noted in Dr. Gruen's report in 2015. Subsequently in 2017, similar findings were revealed in Dr. Loving's report after the second removal and in preparation for trial. Although Dr. Loving recognized some progress, he opined that she would be unable to provide a safe, stable, and healthy home, and that would "continue to be true for the foreseeable future, even if [she] is granted more time to work toward reunification and the opportunity to continue her services." Since the credible evidence indicates Patricia's prognosis is poor, the Division satisfied prong four by clear and convincing evidence.

2. Kevin

Given the weak bond with his children, Dr. Loving opined that terminating Kevin's parental rights would do no harm and, in fact, was good for the children. Notably, Janet was anxious and fearful of meeting her father, although she eventually settled down. Jhana, on the other hand, was cheerful, but indifferent toward Kevin, and Dr. Loving believed that she did not seem to recognize him. Both girls rejected Kevin's attempts at affection. The boys did not attend the bonding session because Joshua experienced a form of separation anxiety.

While James was calm enough to attend the evaluation, he seemed distracted by his brother's absence and would frequently try to leave the room.

Dr. Loving also indicated that there was a risk of harm to the children due to Kevin's history of substance abuse and domestic violence based on past incidents involving Patricia. As with Patricia, we see no reason to disturb the judge's finding that Dr. Loving's bonding evaluation considered together with Kevin's history of incarceration, substance abuse, and domestic violence establishes that termination of his parental rights would not do more harm than good.

Further, Kevin's argument that Dr. Loving's opinion that Kevin's risk of recidivism is a net opinion is without merit. Dr. Loving was qualified as an expert in psychology, and during a psychological evaluation of Kevin involving an interview and document review, he determined that Kevin had a significant criminal history; establishing a risk of recidivism. We see nothing "net" about this opinion.

In sum, we conclude the judge's termination of Patricia and Kevin's parental rights was in their children's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5560-17T2